666 F.Supp. 1573 (1987)
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Plaintiff,
v.
CONSOLIDATED RAIL CORPORATION and United States of America, Defendants.
Civ. A. No. 87-01.
Special Court, Regional Rail Reorganization Act.
August 4, 1987.
*1574 William G. Mahoney, John O'B. Clarke, Jr., Washington, D.C., Richard S. Edelman, for plaintiff Railway Labor Executives' Ass'n.
Richard K. Willard, Joseph E. DiGenova, Sandra M. Schraibman, Richard C. Stearns, Washington, D.C., for defendant U.S.A.
Laurence Z. Shiekman, M. Duncan Grant, Richard A. Levan, Robert S. Natalini, Philadelphia, Pa., for defendant Conrail.
Robert A. Burka, Washington, D.C., Dennis F. Johnson, Rockville, Md., and Jan Schneider, Washington, D.C., for intervenor Brian M. Freeman.
GASCH, P.J., and BRYANT and WEINER, JJ.

MEMORANDUM OPINION AND ORDER
WEINER, District Judge.
This matter involves the impact of the Conrail Privatization Act ("the Act") upon certain portions of an agreement between defendant Consolidated Rail Corporation ("Conrail") and plaintiff Railway Labor Executives' Association ("RLEA"), a representative of Conrail's employees. The disputed portions relate to the payment by Conrail of $207.5 million on behalf of its employees subject to collective bargaining agreements and to the indemnification of RLEA and its financial advisors for any losses resulting from Conrail's privatization. In its first two causes of action, RLEA claims that by refusing to reaffirm its commitment to pay $207.5 million and provide indemnification, Conrail has breached its agreement with RLEA (Count I) and violated the Act (Count II). In the alternative, RLEA claims that should we determine that the Act abrogated Conrail's duty to pay the full $207.5 million or to indemnify RLEA, the Act will work a taking without just compensation in violation of the fifth amendment.[1] Presently before the court are the parties' cross-motions for summary judgment.

The Facts
The undisputed material facts are as follows: In connection with the anticipated privatization of Conrail, RLEA sought to secure for Conrail employees subject to collective bargaining agreements ("Agreement Employees") the preservation of the greatest number of jobs, a return to industry wage levels, compensation for their period of below-industry wages, and the establishment of value for the Employee Stock Option Plan ("ESOP"). See Declaration of Richard I. Kilroy, Chairman of RLEA at paragraph four attached to RLEA's motion for summary judgment ("Kilroy Declaration"). In pursuit of these goals, the RLEA formed a Task Force. The RLEA also engaged the services of Brian M. Freeman and his corporation as its financial advisor (the "Financial Advisor") as well as a number of lawyers, investment bankers and other professional advisors (the "Professional Advisors") to work with the Financial Advisor and the Task Force.[2] The RLEA agreements with most *1575 of these advisors involve fees contingent in amount and/or to be substantially delayed in payment. Through the efforts of the Task Force, the Financial Advisor and Professional Advisors, all of the bidders for Conrail, and ultimately Conrail itself, agreed to job preservation and other employee protection measures, a return to industry wages, compensation of past wage increase deferrals and valuable ESOP rights and other financial benefits for the Agreement Employees. Kilroy Declaration at paragraphs 11, 12. As compensation for past wage increase deferrals, Conrail agreed to pay $207.5 million to or for the benefit of the Agreement Employees. Id.
On September 17, 1985, Conrail entered into an agreement with representatives of several labor organizations representing Conrail employees under the terms of the Railway Labor Act. See Definitive Agreement of September 17, 1985 by and between Conrail and the Undersigned Representatives of Conrail's Agreement Employees ("Definitive Agreement"), RLEA's Exhibit A. RLEA was one of the labor representatives entering this agreement. The provisions of the Definitive Agreement which RLEA now seeks to enforce are contained in Part III, Articles I and V. Article I concerns the $207.5 million in payment by Conrail and Article V concerns Conrail's assurances of indemnity.
In particular, Article I of Part III of the Definitive Agreement provides in section 1 that "Conrail shall pay $207.5 million to or for the benefit of certain present and former Agreement Employees, of which no less than $200 million shall be paid to such Agreement Employees." Sections 2 through 4 of Article I provide that the $207.5 million is to be paid in the following manner: (a) $200 million is paid directly to Conrail's Agreement Employees with each receiving a share proportional to his or her share of the earnings of all Conrail employees in a set period of time; (b) up to $3.5 million is paid for professional advisors' fees of RLEA and the other signatory unions, with such advisors to include attorneys, accountants, investment bankers and commercial bankers; (c) up to $4.0 million is to be paid for the expenses incurred by RLEA, and the other unions, for their financial advisors; and (d) if the payments to the financial advisor and other professional advisors do not reach the $7.5 million combined limit, the balance is paid to the Agreement Employees along with the $200 million.
Article V of Part III of the Definitive Agreement provides that, subject to certain qualifications, Conrail will indemnify RLEA, the other unions which signed the Definitive Agreement, and their professional advisors for losses and costs resulting from any legal action relating to the Definitive Agreement or any other agreement between the parties incident to the privatization of Conrail.
Conrail and RLEA reaffirmed their obligations under the Definitive Agreement in a joint letter dated September 4, 1986 to the Honorable John D. Dingell, Chairman of the House Committee on Energy and Commerce ("Reaffirmation Letter").[3] In *1576 that letter the parties reaffirmed their commitment to the entire Definitive Agreement, then emphasized their reaffirmation of a list of five specific provisions thereof, and asked that they be included in any legislation passed. The payment of the fees of RLEA's financial advisor was number 5 on the list.
One month later, Congress passed and the President signed into law the Conrail Privatization Act, Pub.L. No. 99-509, §§ 4001-4052, 100 Stat. 1892, reprinted in 1986 U.S.Code Cong. and Admin.News. Section 4024 of the Act is titled "Provisions for Employees," and subsection (e) thereof provides:
(e) COMPENSATION FOR WAGES BELOW INDUSTRY STANDARDThe Corporation [Conrail] shall pay $200 [million] to present and former employees subject to collective bargaining agreements, in accordance with the terms and conditions in the Definitive Agreement referred to in subsection (d)(1), or as otherwise agreed between the parties.
A companion section, section 4038(a) on "Employee Issues", provides that performance by Conrail of its obligations under section 4024 fully resolves certain claims against the RLEA as well as against Conrail.[4]
On January 6, 1987, Kilroy wrote to Robert E. Swert, Vice President for Labor Relations at Conrail demanding that Conrail reaffirm its intention to pay for RLEA's Financial Advisor and Professional Advisors. See Conrail's Exhibit C. By letter dated January 9, 1987, Mr. Swert responded that Conrail's obligation to make payments to RLEA's various advisors had been abrogated by sections 4024 and 4038(a)(5) of the Act. Conrail, therefore, was unable to reaffirm any obligation to pay for advisory services "[e]ven though prior to the passage of the Act we had acknowledged our financial obligations to RLEA and its advisors and, absent the Act, would fulfill these obligations...." See Conrail's Exhibit B.
The RLEA then commenced this litigation, seeking inter alia a declaratory judgment that Conrail remains obligated to comply with its commitments in the Definitive Agreement.

Discussion
Conrail admits that it has an affirmative obligation under both the Definitive Agreement and the Conrail Privatization Act to pay $200 million to the Agreement Employees, as well as an obligation under the Definitive Agreement to pay an additional $7.5 million to RLEA for its expenses *1577 and the fees and expenses of its Financial Advisor and Professional Advisors, and to indemnify the RLEA and its advisors for certain claims arising out of the privatization of Conrail. Thus the only issue raised by the cross-motions for summary judgment of Conrail and RLEA on the first and second causes of action is whether the Act abrogates Conrail's obligations under the Definitive Agreement to pay $7.5 million to the RLEA and to indemnify the RLEA. We conclude that it does neither.
The parties argue that a plain reading of the Privatization Act supports their respective views. In Conrail's view, Congress declined to follow all of the contours of the Definitive Agreement. Specifically, Conrail argues that, in section 4024(e) of the Act, Congress elected not to authorize expenditure of the full $207.5 million "to or for the benefit of" the Agreement Employees and instead limited the sum of $200 million to be paid "to" the employees. Conrail further argues that the conclusive effect of section 4024 is substantiated by section 4038 which "resolves" any claim against Conrail under the Definitive Agreement and "resolves" any claim against either RLEA or Conrail "by an advisor, consultant, or other person...."
RLEA, on the other hand, contends that Conrail's interpretation does not give meaning to the entire sentence of section 4024(e). RLEA stresses the final phrases of section 4024(e): that Conrail would pay $200 million to the Agreement Employees "in accordance with the terms and conditions in the Definitive Agreement ... or as otherwise agreed between the parties." RLEA urges that Congress meant what it said, i.e., that "terms and conditions" meant all of the terms and conditions surrounding the $200 million in payment. One of the basic "terms" of the $200 million in payment was that it was to come out of a total payment of $207.5 million, with $7.5 million to be reserved for the fees and expenses of RLEA's advisors.
In opposition to RLEA's argument, Conrail asserts that the phrase "terms and conditions" can only refer to those terms contained in Part III, Article I, section 2 of the Definitive Agreement which sets forth the formula for how the $200 million is to be paid to the Agreement Employees. RLEA has, in turn responded to this assertion by noting that if Congress had intended to refer only to the formula in section 2, it would have so stated. In fact, at another point in the Act involving the Employee Stock Ownership Plan, Congress was very precise when it sought to incorporate another distribution formula set out in Article III of the Definitive Agreement. Section 4024(f)(1)(B) of the Act states, with added emphasis:
... the common stock of [Conrail] shall be contributed by [Conrail] to the ESOP, which shares shall be allocated by the ESOP to persons who are or were ESOP participants in accordance with the formula set forth in section 2 of Article II of Part III of the Definitive Agreement ....
Thus, argues RLEA, since Congress referred generally to the terms and conditions of the Definitive Agreement in section 4024(e) concerning the $200 million payment, presumably Congress meant all of the terms and conditions in sections 1 through 4 of Article III of the Agreement and not just section 2.
The language of section 4024(e) of the Act requires Conrail to pay "$200 [million] to present and former employees subject to collective bargaining agreements in accordance with the terms and conditions in the Definitive Agreement...." The precise terms and conditions of this payment are set forth in Article I of Part III of the Definitive Agreement. Section 1 of that Article provides that:
Conrail shall pay $207.5 million to or for the benefit of certain present and former Agreement Employees, of which no less than $200 million shall be paid to such Agreement Employees.
Section 2 of that Article describes the method for determining how much each employee will receive. Section 3 provides for Conrail's payment of RLEA's expenses and the fees and expenses of its advisors. Under section 4, any remainder is to be paid to the Agreement Employees. *1578 Conrail's contention that Congress intended that Conrail would pay only $200 million to the Agreement Employees would render the reference in section 4024(e) to "terms and conditions" meaningless. It would ignore the essence of section 1 that Conrail pay $207.5 million to or for the benefit of certain present and former Agreement Employees as well as all of sections 3 and 4. If Congress had intended that Conrail pay only $200 million to the Agreement Employees, it presumably would have so provided expressly, rather than directing Conrail to abide by "the terms and conditions" of the Definitive Agreement. We, therefore, find the most logical reading of section 4024(e) to be that "terms and conditions" means all of the terms and conditions surrounding the $200 million payment, the most basic is that the payment come out of a total payment of $207.5 million.
Our conclusion is bolstered by the legislative history of section 4024(e). The legislative history of the Act consists solely of a joint floor statement by several members of Congressman Dingell's Committee on Energy and Commerce. See Floor Statement on ConrailH.R. 5300, Conrail Privatization Act, 132 Cong.Rec. H8166 (daily ed. Sept. 24, 1986) (RLEA's Exhibit D). With regard to section 4024 of the Act, concerning Conrail's obligation to pay its Agreement Employees, the statement explains:
Subsection (e) requires Conrail to pay, in compensation for past wages below industry standard, $200 million to present and former agreement employees in accordance with its September 17, 1985 agreement, or as otherwise agreed between the parties. We expect Conrail to pay other obligations to the Railway Labor Executives' Association only for legitimate verified claims for actual services rendered (such as legal fees).

(Emphasis added). We believe it is evident from this emphasized language that Congress intended section 4024(e) to incorporate Conrail's commitment to pay RLEA for its expenses and the fees and expenses of its Financial Advisor and Professional Advisors.
Conrail urges that it is significant that Congress "expected" but did not "require" Conrail to pay RLEA's verified fees for professional services rendered to the RLEA. Conrail suggests that the court should discount this "expectation" as a "prospective discussion" of "uncertain" and "largely unidentified" future obligations. However, we find it difficult to believe that the expectation which Congress speaks of refers to "unidentified" future obligations rather than to the Conrail/RLEA agreement on advisors' fees. It is more reasonable to assume that Congress "expected" Conrail to carry through with its explicit contractual commitment, freely undertaken and reaffirmed in the Reaffirmation Letter to Chairman Dingell, that it would pay RLEA's verified expenses and advisors' fees. As a result of the Reaffirmation Letter to Chairman Dingell, Congress knew of Conrail's specific commitment toward "[t]he payment of the fees of RLEA's financial and other advisors." See RLEA's Exhibit M. In fact, the joint statement specifically states that "we [Congress] expect Conrail to pay other obligations ... for legitimate verified claims for actual services rendered (such as legal fees)" (emphasis added). Thus, while Congress may not have specifically stated in section 4024(e) under which of the four terms and conditions of the section of the Definitive Agreement dealing with the $200 million payment Conrail was to pay the Agreement Employees $200 million, the legislative history of section 4024 clearly reveals that at the very least Congress expected one of those four terms, Conrail's payment of advisors' fees accumulated by RLEA (Part III, Article I, Section 3), to be followed.
Conrail's contention that the phrase "in accordance with the terms and conditions in the Definitive Agreement" refers specifically to the terms and conditions contained in Part III, Article I, Section 2 of the Definitive Agreement must be rejected. If Congress had intended "terms and conditions" to refer only to the formula for distributing *1579 the money to the Agreement Employees in section 2 it could have specifically so stated. In fact, Congress did exactly that when it sought to incorporate the formula for distribution of Conrail common stock to the Employee Stock Ownership Plan. Section 4024(f)(1)(B) of the Act states that:
[C]ommon stock of [Conrail] shall be contributed by [Conrail] to the ESOP, which shares shall be allocated by the ESOP to persons who are or were ESOP participants in accordance with the formula set forth in Section 2 of Article II of Part III of the Definitive Agreement ....
(Emphasis added). Thus, when Congress intended to incorporate only the formula for distribution of stock of the ESOP, it explicitly referred only to the distribution formula. In section 4024(e), however, Congress referred generally to the terms and conditions of the Definitive Agreement.
Conrail's reliance on the language of section 4038(a)(5) is also unavailing. As noted above, that section states that section 4024 completely and finally "resolves" all claims against Conrail or the RLEA "by any advisor, consultant, or other person who has provided services" to either entity. Conrail argues that since section 4024 states explicitly that Conrail is to only pay $200 million to the Agreement Employees, all other claims including those for advisors fees and indemnification have been resolved i.e., eliminated. We do not agree that section 4038(a)(5) eliminates the claim for advisors' fees. If it were Congress' intention to eliminate this claim, it could have used the word "extinguishes" instead of "resolves" as it did in section 4038(a)(1). Moreover, in light of Congress' knowledge of Conrail's specific commitment toward "[t]he payment of the fees of RLEA's financial and other advisors" as well as the undisputed fact that the RLEA's advisors performed valuable services for the Agreement Employees, we doubt that Congress intended to allow Conrail to obtain a windfall by merely eliminating its affirmed obligation to pay the advisors' fees. Indeed, the legislative history of section 4024(e) indicates that Congress intended Conrail to meet this obligation. It is more likely that section 4038(a)(5) means that section 4024(e) "resolves" or "clears up" any outstanding claims by advisors and consultants against Conrail or the RLEA (including the 7.5 million in advisors' fees) by requiring payment of such outstanding claims.
For all the foregoing reasons, we conclude that the Act does not abrogate Conrail's obligation to pay $7.5 million to RLEA for its expenses and fees and expenses of its advisors.
The RLEA also contends that the Conrail Privatization Act did not abrogate Conrail's duty to indemnify RLEA, its advisors, and the labor unions for legal claims arising out of the privatization/public offering of Conrail, or their roles with respect thereto. The Act itself contains no provision for indemnification. As a matter of fact the term is not mentioned. Conrail urges that the absence of such a provision reflects Congress' intention to eliminate Conrail's pre-Act obligation to indemnify. Memorandum of Law in Support of Defendant Consolidated Rail Corporation's Motion for Summary Judgment as to Plaintiff's First and Second Causes of Action at 12 ("Defendant's Memorandum"). In support of its contention, Conrail contends first that despite the urging of the parties to the chairman of the House committee considering the Act to incorporate the Definitive Agreement into any legislation passed, Congress in fact "declined to follow all the contours of the Definitive Agreement." Defendant's Memorandum at 9-10.
However, the parties did not request in their letter that "all the contours of the Definitive Agreement" be included in the Act. The indemnification provision was not included in the list of items urged upon the Congress. Therefore, the fact it was not included in the Act cannot provide the basis for an assertion that Congress considered and rejected indemnification. It is more reasonable to infer that Congress considered for inclusion in the Act only those *1580 five key provisions brought to their attention, and left the parties to their private agreement, reaffirmed in the letter to Congressman Dingell, to resolve ancillary matters. Clearly there is no indication in the record that the parties intended not to be bound by provisions of the Definitive Agreement which Congress did not include in its legislation. As a matter of fact, it is interesting to note in this regard that Part IV, Article II of the Definitive Agreement provides for virtually identical indemnification if the Congress did not act to authorize privatization.
Conrail further argues in support of its claim that section 4024 of the Act incorporates several terms of the Definitive Agreement. Section 4024 is in turn, it is argued, made conclusive by section 4038(a). Section 4038(a), under Conrail's view, eliminates any obligations on the part of Conrail which were not explicitly incorporated in section 4024. A careful reading of section 4038(a), however, undercuts rather than supports Conrail's argument that the Act abrogates its obligation to indemnify. Conrail relies specifically upon subsections (a)(2) and (a)(5) for support of this claim.
Section 4038(a)(5) cannot reasonably be interpreted to address the issue of indemnification at all. This section, by its language, specifically resolves only claims against the RLEA or Conrail by consultants or other persons who had rendered services to the RLEA, i.e., for services rendered. This is in sharp contrast to the indemnification sections of the Definitive Agreement which protect the RLEA and the labor unions, as well as their advisers from losses and costs which they could potentially incur in litigating actions brought by various parties who have provided no services and thus have no claim for services rendered. Definitive Agreement, Part III, Article IV, section 4. As we have already suggested, a more logical reading of section 4038(a)(5) is that it resolves the claims of the advisers by limiting them to the $7.5 million allowed under the terms of the Definitive Agreement as adopted in section 4024.
The language of section 4038(a)(2) is broader and somewhat more ambiguous in its reference than is section 4038(a)(5). It appears however to address the situation in which an employee or group of employees sued Conrail and/or the RLEA or the labor unions because of dissatisfaction with some aspect of the Definitive Agreement. The legislative history of section 4038(a) lends support to this view, see H.R. 5300, Conrail Privatization Act, 132 Cong.Rec. H8168 (daily ed. Sept. 24, 1986):

Section 4738. Resolution of Certain Issues
Subsection (a) makes clear that the employee provisions in section 4724 completely and finally resolve any rights under section 401(e) of the 3R Act and certain other claims.
The last three words "certain other claims" appear to refer to employee claims other than those which might arise under section 401(e) of the 3R Act.
In addition, this reading of section 4038(a)(2) is also given support by the context in which the section is found. Section 4038(a) is subtitled "employee issues",[5] and four of the five subsections contained in this section clearly deal with specific areas of possible claims by employees. Each of these sections attempts to resolve the area addressed by reference to section 4024 where the issue is dealt with in some detail, and makes that section conclusive in its resolution of the potential claims. In the broader reading which Conrail urges, subsection (a)(2) is interpreted as eliminating every portion of the Definitive Agreement not specifically mentioned in section 4024. It is not reasonable, however, to accept such a reading, as it is unlikely that such a *1581 sweeping legislative decision would be expressed in one subsection of five where the other four are narrow, focused subsections. It is more reasonable to assume that subsection (a)(2) was also intended to be narrow in its focus.
A narrow reading of subsection (a)(2) is also required by the rule protecting private contractual rights. Where a statute tends to interfere with the common law, any abrogation of that law must be clearly expressed by the legislature.[6] This rule of strict construction applies not only to judge-made law, but to abrogation of rights developed under that law or rights which are considered basic, such as contract rights.[7] If Congress wishes to abrogate those rights, it must do so either explicitly, or by strong implication, i.e., by enacting legislation which is clearly incompatible with the contract. Section 4038(a)(2) does not explicitly abrogate the entire Definitive Agreement, and does not appear to enact provisions contrary to it. Therefore we will not adopt a reading of the section which eliminates the rights and obligations contained in that agreement.
We believe this approach is compelled by yet another important factor. "Valid contracts are property, whether the obligor be a private individual ... or the United States," Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). RLEA has a property interest in the rights created under Part III, Article V of the Definitive Agreement. In Conrail's interpretation of section 4038(a)(2), a substantial issue would be raised then as to whether or not the statute, by abrogating Conrail's obligation to indemnify the RLEA effected an unconstitutional taking under the 5th amendment. Our more narrow reading in contrast avoids this constitutional issue, and thus is compatible with fundamental principles of construction. When a statute is ambiguous courts must "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." Johnson v. Robison, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974), citing United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 389 (1971). See also Regional Rail Reorganization Act Cases, 419 U.S. 102, 134, 95 S.Ct. 335, 354, 42 L.Ed.2d 320 (1974), quoting United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944). Thus "when one interpretation would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a clear statement of a contrary legislative intent." United States v. Thompson, 452 F.2d 1333, 1337 (D.C.Cir. 1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).
In summary, the Act did not abrogate the obligation of Conrail to indemnify the RLEA, their advisors, and the labor unions for losses and costs associated with litigation arising out of the attempt to privatize. Section 4038(a)(5) does not address the issue at all. Section 4038(a)(2) is ambiguous, and appears to address the issue of employee suits, rather than indemnification under the Definitive Agreement. In neither section does the Act explicitly annul the Definitive Agreement or its provisions for indemnification. Neither enacts a provision which is incompatible with the continued obligation of Conrail to indemnify according to the terms of the Definitive Agreement. *1582 Therefore, under a narrow construction of the Act Conrail remains so obligated to indemnify the RLEA, their advisors and the labor unions. In light of this disposition, it is not necessary for us to consider the motion of RLEA for summary judgment on alternative Count III of the complaint or the motion of the United States to dismiss Count III. Therefore plaintiff's motion for summary judgment on Counts I and II of the complaint is granted. Conrail's motion for summary judgment is denied.
IT IS SO ORDERED.
NOTES
[1] The United States of America is also named as a defendant in this count.
[2] The RLEA entered into a letter agreement with the Financial Advisor on September 14, 1982 ("Freeman Agreement"). Under the terms of the Freeman Agreement, the Financial Advisor received an "advisory fee" in quarterly installments of $25,000.00. The Agreement also promised a "success fee" of one-half of one percent (0.5%) "of the equity ... and other considerations" received by Conrail's employees. This success fee was to be reduced by the amount of previous "advisory fee" payments. Kilroy Declaration at paragraph 8. See also the Freeman Agreement which appears as RLEA's Exhibit E. The term of the Freeman Agreement was twice formally extended, through December 31, 1986, and the Financial Advisor continues to serve the RLEA to date. Kilroy Declaration at paragraph 10. The two letters extending the term of the Freeman Agreement appear as RLEA's Exhibits F and G.
[3] The Reaffirmation Letter in pertinent part reads:

In connection with the preparation of legislation for the sale of Conrail through a public offering of Conrail's common stock, this is to advise you that Conrail and RLEA reaffirm the provisions set forth in the Definitive Agreement between the parties dated September 17, 1985 except insofar as modification may be required in that the transaction now contemplated is a direct public offering rather than an acquisition of Conrail stock by an investor group and its subsequent resale to the public.
Conrail and RLEA, among the other provisions of the September 17, 1985 agreement, specifically reaffirm their commitment to the following provisions embodied in that September 17, 1985 Agreement:
1. A cash payment to Conrail's agreement employees in satisfaction of claims asserted and notices served under Section 6 of the Railway Labor Act with respect to employee wage increase deferrals;
2. The implementation of a plan for employee labor protection.
3. The acceleration of the allocation and distribution of Conrail common stock held by Conrail's tax-qualified Employee Stock Ownership Plan;
4. The designation by RLEA of two members of Conrail's Board of Directors; and
5. The payment of the fees of RLEA's financial and other advisors.
In addition, Conrail and the RLEA also concur that the ESOP shareholders' interests are best served if Morgan Stanley is the lead manager of the initial public offering.
Conrail and RLEA request, if you deem it appropriate, that statutory provisions implementing the applicable provisions of the September 17 Agreement be included in any legislation which may be enacted providing for the public sale of Conrail stock.
Letter to Hon. John D. Dingell, Chairman, House Committee on Energy and Commerce, from Richard I. Kilroy, Executive Secretary and Treasurer, RLEA, and Robert E. Swert, Vice PresidentLabor Relations, Conrail, dated September 4, 1986.
[4] Sec. 4038. RESOLUTION OF CERTAIN ISSUES.

(a) EMPLOYEE ISSUES.Section 4024 completely and finally
(1) extinguishes all employee rights, and any obligation of the United States, under section 401(e) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 761(e)) as in effect immediately before the date of the enactment of this Act;
(2) resolves any and all claims against the Corporation or any other person arising under the Definitive Agreement referred to in section 4024(d)(1) or any other agreement containing similar terms and conditions;
(3) resolves all claims to pay entitlements arising out of the pay increase deferrals by present and former employees of the Corporation under the Agreement of May 5, 1981, between Conrail and Certain Labor Organizations for Labor Contributions to Self-Sufficiency for Conrail;
(4) resolves all issues raised by notices served by representatives of such employees under section 6 of the Railway Labor Act proposing repayment of or compensation for such deferrals; and
(5) resolves all claims against the Railway Labor Executives' Association or the Corporation by any adviser, consultant, or other person who has provided services to such association in connection with any matter referred to in this part.
[5] Where a subtitle descriptive of legislation is part of the act, rather than having been added by a compiler or publisher, it is to be taken as an expression of Congressional intent in creating the legislation and may be looked to in interpreting the statute. Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1039 (D.C.Cir.1986).
[6] See United States v. Tilleraas, 709 F.2d 1088, 1092 (6th Cir.1983), where the United States sued to recover payments made as a surety on student loans. The Court of Appeals held that the surety's common law right to subrogation was not abrogated by an ambiguous statutory construction. See also Checkrite Petroleum Inc. v. Amoco Oil Co., 678 F.2d 5, 8 (2d Cir.1982).
[7] See C. Sands, Statutes and Statutory Construction § 61.06 (4th ed. 1974) ("The rule that statutes in derogation of natural or common law rights are to be strictly construed is now generally recognized as being a corollary of the rule that statutes in derogation of the common law are to be strictly construed interpreted strictly. It has most often been employed where the statute threatens to invade an existing property or contract right or tends to interfere with a cherished personal liberty.")