**TIME WARNER CABLE, a division of Time Warner Entertainment Company, L.P., Plaintiff–Appellant,**

v.

**James E. DOYLE, in his capacity as Attorney General of the State of Wisconsin, and Alan T. Tracy, in his capacity as Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection, Defendants–Appellees.**

No. 94–1894.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1994.*

Decided Sept. 25, 1995.

* Following oral argument, the court invited the Federal Communications Commission to submit an amicus brief outlining the Commission's position on the issues presented for decision.

Robert D. Joffe, Stephen S. Madsen, Eric H. Jaso, Stuart W. Gold (argued), Cravath, Swaine & Moore, New York City, Robert H. Friebert, Friebert, Finerty & St. John, Milwaukee, WI, for plaintiff-appellant Time Warner Cable, a division of Time Warner Entertainment Company, L.P.

James D. Jeffries, Assistant Attorney General, Bruce A. Craig (argued), Office of Attorney General, Wisconsin Department of Justice, Madison, WI, for defendant-appellee James E. Doyle, in his capacity as Attorney General of the State of Wisconsin.

Charles D. Hoornstra, Assistant Attorney General, Office of Attorney General, Wisconsin Department of Justice, Madison, WI, for defendant-appellee Alan T. Tracy, in his capacity as Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection.

Charles G. Fergus, Office of Attorney General, Chicago, IL, for amicus curiae State of Illinois.

Jack A. Norris, Todd I. Stone, Office of Attorney General, Hollywood, FL, for amicus curiae Multi–State Cable Task Force.

Daniel M. Armstrong, William Kennard, Federal Communications Commission, Washington, DC, for amicus curiae Federal Communications Commission.

Before FERGUSON,** RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

In this appeal, we are asked to determine whether the State of Wisconsin's prohibition of certain negative option billing practices of Time Warner Cable ("Time Warner") is preempted by the federal regulatory scheme.

The district court entered judgment in favor of the State. It held that the applicable state statute, Wis.Stat. § 100.20, was not preempted by the Cable Television Consumer Protection and Competition Act of 1992 ("1992 Cable Act"), 47 U.S.C. §§ 521–559, and that it would contravene the congressional intent to read FCC regulation 47 C.F.R. § 76.981 as authorizing Time Warner's disputed billing practices. For the reasons that follow, we reverse the judgment of the district court.

## I

## BACKGROUND

### A. Facts

Time Warner Cable, a division of Time Warner Entertainment Company, operates cable television systems in several Wisconsin communities. Prior to September 1, 1993, Time Warner offered its Wisconsin subscribers two types of programming packages, or "tiers." Every subscriber received the "basic" tier. This tier included local network affiliates, a public broadcasting channel, and two "superstation" channels: Chicago-based WGN and Atlanta-based WTBS. Most subscribers also purchased the "standard" tier. Programming offered on this tier included MTV, CNN, ESPN, the USA Network, and the Discovery Channel. Various movie channels could be added for additional fees.

Pursuant to section 3 of the 1992 Cable Act, 47 U.S.C. § 543, the Federal Communications Commission ("FCC" or "Commission") promulgated various cable rate regulations that became effective September 1, 1993. In response to these regulations, Time Warner restructured its service tiers. As of September 1, 1993, Time Warner "unbundled," or removed, WTBS and WGN from its basic tier. In Milwaukee, the company also removed the Discovery Channel and E! Entertainment Television from its standard tier.[1] Time Warner then began offering the

---

** The Honorable Warren J. Ferguson of the United States Court of Appeals for the Ninth Circuit is sitting by designation.

1. The state administrative action discussed in the text also concerns Time Warner's billing practices in the Brookfield and Plymouth–Dacada communities. Time Warner offered fewer total channels in these communities and charged slightly less per month for its services than it charged Milwaukee subscribers. In addition, Time Warner did not remove the same number of channels in each community. Nevertheless,

deleted channels on an "à la carte," or per-channel basis. Milwaukee subscribers were offered the four removed channels for $0.79 a month each, or as a package for $2.20 per month.

Time Warner continued to provide the à la carte package to its existing customers. Thus, subscribers received the same number of channels that they had received previously. Time Warner also began charging its existing customers the additional monthly fee for the à la carte package. However, subscribers who had been purchasing both the basic and standard tiers noticed no increase in their monthly bills. Time Warner maintained the pre-September 1, 1993 cost of service by altering the price of its basic and standard tier packages. In Milwaukee, for example, Time Warner raised the price of the basic tier from $10.45 to $11.65 per month and reduced the price of the standard tier from $13.65 to $10.25 per month. Existing subscribers therefore paid $24.10 per month for the basic, standard, and à la carte services ($11.65 + $10.25 + $2.20), just as they previously had paid $24.10 per month ($10.45 + $13.65) for the basic and standard tier services. Thus, following Time Warner's programming restructuring, customers who had been subscribing to both the basic and standard tier packages found themselves paying the same amount per month for the same number of channels. Only the format of the services for which they were paying had changed.

Time Warner notified its existing customers that it had altered the basic and standard tier packages and had created the new à la carte channels. Subscribers were informed that they could cancel the à la carte package at any time. However, Time Warner continued to provide the à la carte package to its existing customers, and continued charging them for this now-separate package, unless they called to cancel. New subscribers did not receive the à la carte channels unless they specifically ordered them.

The State of Wisconsin became concerned about Time Warner's à la carte billing policy. The State believed that, as it related to existing customers, the policy constituted "negative option billing," a practice whereby a company places a charge for an unordered service on customers' bills and requires those who do not want the service affirmatively to reject the charge. Acting through its attorney general, the State brought an enforcement action against Time Warner before the Wisconsin Department of Agriculture, Trade & Consumer Protection. The State contended that Time Warner's method of charging existing customers for the à la carte channels constituted an unfair trade practice in violation of Wis.Stat. § 100.20.[2] The State sought an injunction prohibiting Time Warner from charging for an à la carte channel unless the customer specifically requested it. It also sought an order requiring Time Warner to disgorge the income it had earned through the alleged unfair trade practice. Time Warner responded by filing suit in the district court. It sought to enjoin the state administrative proceeding. The parties agreed to stay the state administrative proceeding pending resolution of Time Warner's suit.

Time Warner engaged in the same alleged unfair trade practice in all three areas by charging customers for à la carte channels even though they had not specifically requested them. To simplify the factual discussion, we have focused upon Time Warner's service restructuring in Milwaukee.

2. The Wisconsin statute provides, in pertinent part:

(1) Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.
(2) The department, after public hearing, may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair. The department, after public hearing, may issue general orders prescribing methods of competition in business or trade practices in business which are determined by the department to be fair.

\* \* \* \* \* \*

(4) The department of justice may file a written complaint with the department alleging that the person named is employing unfair methods of competition in business or unfair trade practices in business or both.... [A] representative of the department of justice designated by the attorney general may appear before the department in such proceedings. Wis.Stat. § 100.20.

## B. *District Court Proceedings*

The district court denied Time Warner's motion for summary judgment and entered judgment in favor of the State. *Time Warner Cable v. Doyle*, 847 F.Supp. 635 (W.D.Wis.1994). In sum, the district court concluded that, to the extent that the FCC regulation could be read as permitting Time Warner's billing practices, the regulation was in conflict with the statutory language of the 1992 Cable Act. The court further concluded that Wisconsin's regulation of negative option billing did not constitute cable rate regulation. In the following paragraphs, we shall describe the district court's reasoning in more detail.

At the outset, the district court turned to the language of the 1992 Cable Act and observed that it prohibits negative option billing. The pertinent section provides:

(f) Negative Option Billing Prohibited.—A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. For purposes of this subsection, a subscriber's failure to refuse a cable operator's proposal to provide such service or equipment shall not be deemed to be an affirmative request for such service or equipment.

47 U.S.C. § 543(f). It also noted that the Commission had promulgated a negative option billing regulation, 47 C.F.R. § 76.981, that generally proscribed negative option billing, but carved out an exception in cases involving "the addition or deletion of specific channels from an existing tier of service."

At the time of the district court's decision, the regulation stated:

A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. This provision, however, shall not preclude the addition or deletion of a specific program from a service offering, the addition or deletion of specific channels from an existing tier of service, or the restructuring or division of existing tiers of service that do not result in a fundamental change in the nature of an existing service or tier of service provided that such change is otherwise consistent with applicable regulations. A subscriber's failure to refuse a cable operator's proposal to provide such service or equipment is not an affirmative request for service or equipment. A subscriber's affirmative request for service or equipment may be made orally or in writing.

47 C.F.R. § 76.981 (1993).[3]

Time Warner argued that its billing activity fell within the regulatory exception and that, consequently, the FCC's regulation preempted Wisconsin's regulation of the same activity under its unfair trade practices statute. In Time Warner's view, the federal regulation permitted the billing practice as a permissible option and therefore state law that forbade the practice was preempted because it conflicted with the federal scheme. The State's response was two-pronged. It submitted that the federal regulation did not authorize Time Warner's billing practice. In the alternative, it contended that, if the federal regulation did authorize the billing practice, the regulation could not be squared with

---

**3.** The FCC subsequently modified the regulation as follows:

(a) A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. A subscriber's failure to refuse a cable operator's proposal to provide such service or equipment is not an affirmative request for service or equipment. A subscriber's affirmative request for service or equipment may be made orally or in writing.

(b) The requirements of paragraph (a) of this Section shall not preclude the adjustment of rates to reflect inflation, cost of living and other external costs, the addition or deletion of a specific program from a service offering, the addition or deletion of specific channels from

an existing tier or service, the restructuring or division of existing tiers of service, or the adjustment of rates as a result of the addition, deletion or substitution of channels pursuant to Section 76.922 of this Subpart, provided that such changes do not constitute a fundamental change in the nature of an existing service or tier of service and are otherwise consistent with applicable regulations.

(c) State and local governments may not enforce state and local consumer protection laws that conflict with or undermine paragraphs (a) or (b) of this Section or any other sections of this Subpart that were established pursuant to Section 3 of the 1992 Cable Act, 47 U.S.C. § 543.

47 C.F.R. § 76.981 (1994).

the language of the federal statute and therefore was invalid.

The district court assumed that Time Warner had interpreted correctly the Commission's regulation. It therefore proceeded on the assumption that the federal regulation permitted Time Warner's billing practice. Nevertheless, the court agreed with the State that such a reading of the federal regulation was entitled to no deference because it contravened congressional intent. The district court pointed out that the negative option billing provision of the 1992 Cable Act forbade cable operators from charging subscribers for services they had not "affirmatively requested by name." In the district court's view, this language precluded the FCC from allowing Time Warner to charge existing subscribers for the à la carte channels without first obtaining their permission. Although the à la carte channels had once been part of service tiers that these subscribers had "affirmatively requested," the district court reasoned that the subscribers had never "affirmatively requested" these channels "by name." Because the Wisconsin prohibition against negative option billing did not interfere with a *valid* federal regulation, concluded the district court, the State was not precluded from enforcing its proscription.[4]

The district court also rejected Time Warner's claim that Wis.Stat. § 100.20 was preempted because it served to regulate cable rates. The 1992 Cable Act generally prohibits states from regulating cable rates. *See* 47 U.S.C. § 543(a)(1).[5] Time Warner argued that Wisconsin's enforcement action would violate this prohibition by establishing a rate of "zero" for the à la carte package. The district court rejected this claim on the ground that Wisconsin's enforcement action would have only an indirect effect on Time Warner's rates. The court noted, but did not hold, that it might be problematic to require Time Warner to disgorge the funds it had earned under the disputed billing practice. The court suggested that the State could avoid this issue by simply fining Time Warner. Subsequently, the State agreed not to seek a disgorgement order against Time Warner; in return, Time Warner agreed to market affirmatively its à la carte channels to its existing customers.

## II

### DISCUSSION

We review the district court's decision to deny Time Warner's motion for sum-

---

4. The district court also addressed Time Warner's contention that, even if the FCC did not intend to preempt all state regulation of negative option billing practices, it did intend to permit state regulation only with respect to basic service. Time Warner had argued that the FCC's Report and Order, *In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Report and Order, and Further Notice of Proposed Rulemaking*, 8 F.C.C.R. 5631, 5905 n. 1095 (adopted Apr. 1, 1993, released May 3, 1993), had noted:

> We do not preclude state and local governments from adopting rules or taking enforcement action relating to basic services and equipment[.]

The State had replied that another provision of the 1992 Cable Act, 47 U.S.C. § 552(c)(1), specifically allowed the state to enforce its consumer protection law "to the extent not specifically prohibited by" the Cable Act. Time Warner's rejoinder was that § 552(c)(1) had to be construed to include the FCC's regulations. The district court rejected the argument on the ground that the FCC's negative billing option regulation set out above could not be considered a specific preemption of the State's consumer protection laws.

5. Section 543(a) provides, in relevant part:

> **Competition preference; local and Federal Regulation**
>
> **(1) In general**
>
> No Federal agency or State may regulate the rates for the provision of cable service to the extent provided under this section and section 532 of this title. Any franchising authority may regulate the rates for the provision of cable service or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section. No Federal agency, State, or franchising authority may regulate the rates for cable service of a cable system that is owned or operated by a local government or franchising authority within whose jurisdiction that cable system is located and that is the only cable system located within such jurisdiction.
>
> **(2) Preference for competition**
>
> If the Commission finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the Commission or by a State or franchising authority[.]
>
> 47 U.S.C. § 543(a).

mary judgment de novo. *Butler v. Encyclopedia Brittanica, Inc.*, 41 F.3d 285, 288 (7th Cir.1994).[6]

## A.

■■■ We preface our analysis with a brief review of the principles governing preemption. The Supremacy Clause of our Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to this authority, the Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). In determining whether the Congress has preempted state law, our task is to discern congressional intent. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992). Preemption "will not lie unless it is 'the clear and manifest purpose of Congress.'" *CSX Transp., Inc. v. Easterwood*, —— U.S. ——, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Indeed, the Supreme Court has instructed us to be reluctant in finding

---

**6.** Although Time Warner seeks to enjoin a state administrative enforcement action, there is no cause for abstention under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny. Wisconsin has agreed to stay its state administrative proceedings pending our resolution of the preemption issue, and has not argued for abstention. *See Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 480, 97 S.Ct. 1898, 1904, 52 L.Ed.2d 513 (1977) (holding that states may waive *Younger* abstention argument); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 n. 1, 112 S.Ct. 2031, 2036 n. 1, 119 L.Ed.2d 157 (1992) ("Petitioner [attorney general of Texas] has not argued for abstention, and the federal-state comity considerations underlying *Younger* are accordingly not implicated."); *Brown v. Hotel & Restaurant Employees & Bartenders Int'l Union, Local 54*, 468 U.S. 491, 500 n. 9, 104 S.Ct. 3179, 3184 n. 9, 82 L.Ed.2d 373 (1984) ("Since the State's Attorney General has ... agreed to our adjudication of the controversy, considerations of comity are not implicated, and we need not address the merits of the *Younger* abstention claim."); *cf. Nelson v. Murphy*, 44 F.3d 497, 501 (7th Cir.1995) ("The principle of *Younger* is that a party to a state proceeding affecting important governmental interests must resolve the dispute in the state's preferred tribunal."), *petition for cert. filed*, (U.S. June 8, 1995) (No. 94–2053).

Similarly, there is no cause for abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). A court should abstain, under *Burford*, from interfering with the proceedings of a state administrative agency if (1) there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) if the "exercise of federal review ... would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *See New Orleans Pub. Serv., Inc. v. New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514–15, 105 L.Ed.2d 298 (1989) ("NOPSI"); *Nelson*, 44 F.3d at 500–01 (same); *see also General Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 709 (7th Cir.1991) (stating that *Burford* analysis should consider (1) whether suit is based on cause of action that is exclusively federal; (2) whether difficult or unusual state laws are at issue; (3) whether there is a need for coherent state doctrine in the area; (4) whether state procedures indicate a desire to create special state forums to adjudicate the issues presented). Time Warner's claim does not involve difficult or complex issues of state law. Moreover, although our decision may prevent Wisconsin from enforcing its unfair trade practices law in this particular dispute, "*Burford* ... does not require abstention whenever there exists such a [complex administrative] process, or even in all cases where there is a potential for conflict with state regulatory law or policy." *NOPSI*, 491 U.S. at 362, 109 S.Ct. at 2515 (quotation and citation omitted). Indeed, "there is ... no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Id.* at 363, 109 S.Ct. at 2515 (quotation and citation omitted). Finally, as our colleagues in the Fourth Circuit recently noted in a case concerning the preemptive effect of an FCC regulation, "several circuit courts have emphasized that *Burford* abstention is particularly inappropriate when preemption issues are present." *Neufeld v. City of Baltimore*, 964 F.2d 347, 350 (4th Cir.1992) (collecting cases); *see also Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n*, 791 F.2d 1111, 1115–16 (3d Cir.1986) (discussing the issue and noting agreement with decisions collected in *Neufeld*). *But cf. Aluminum Co. of Am. v. Utils. Comm'n*, 713 F.2d 1024, 1029–30 (4th Cir.1983) (suggesting that abstention may be appropriate in preemption cases where detailed fact finding is required), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); *General Ry. Sig. Co.*, 921 F.2d at 708 (noting that *Burford* inquiry is fact intensive). The appellate record in this case makes clear that no such fact finding is required here.

federal preemption of a subject "traditionally governed by state law." *Id.*

 Evidence of preemptive purpose "is sought in the text and structure of the statute at issue." *Id.* "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* However, "[p]re-emption ... is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982) (quotations and citation omitted). The Court has indicated that preemption may occur when:

> Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Louisiana Public Service Comm'n,* 476 U.S. at 368–69, 106 S.Ct. at 1898–99 (citations omitted); *see also de la Cuesta,* 458 U.S. at 152–53, 102 S.Ct. at 3022–23. In sum, preemption may arise through an express congressional statement defining the preemptive reach of a statute ("express preemption"), implicitly, when Congress manifests its intent to occupy an entire field of regulation ("field preemption"), or through conflict between state and federal law, when it either is impossible to comply with both, or when state law stands as an obstacle to the accomplishment of the full congressional objectives ("conflict preemption"). *American Agric. Movement, Inc. v. Board of Trade,* 977 F.2d 1147, 1154 (7th Cir.1992).[7]

 Preemption also may occur through the promulgation of federal regulations. *See de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022 ("Federal regulations have no less pre-emptive effect than federal statutes."). As Justice White, writing for the Court in *City of New York v. FCC,* noted, the phrase "Laws of the United States" in the Supremacy Clause "encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." 486 U.S. 57, 63, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988); *see also Wabash Valley Power Ass'n v. Rural Electrification Admin.,* 988 F.2d 1480, 1485 (7th Cir.1993) (same). Accordingly, "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 369, 106 S.Ct. at 1898–99. As Justice White explained in *City of New York:*

> The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. Beyond

---

7. In *American Agriculture Movement, Inc.,* we cited the Supreme Court's decision in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), for the proposition that we may resort to analysis under field and conflict preemption "[o]nly if a statute is devoid of explicit preemptive language." *See* 977 F.2d at 1154 (citing plurality opinion and opinion of Blackmun, J., concurring in relevant part). Recently, however, the Supreme Court has stated that *Cipollone* does not stand for this blanket proposition. *See Freightliner Corp. v. Myrick,* — U.S. —, — —, 115 S.Ct. 1483, 1487–88, 131 L.Ed.2d 385 (1995). The Court noted that, although the inclusion of an express definition of the preemptive effect of the statute supports a reasonable inference that the Congress did not intend to preempt other matters, the existence of that inference does not foreclose all possibility of implied preemption. The Court noted that *Cipollone* itself conducted "a conflict pre-emption analysis" even though the statute at issue contained an express preemption provision. *Freightliner Corp.,* — U.S. at —, 115 S.Ct. at 1488. The Court further noted that "[o]ur subsequent decisions have not read *Cipollone* to obviate the need for analysis of an individual statute's pre-emptive effects." 115 S.Ct. at 1488 (citations omitted). Thus, the Court concluded, "[a]t best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." — U.S. at —, 115 S.Ct. at 1488.

that, however, in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area. It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to preempt represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned. 486 U.S. at 64, 108 S.Ct. at 1642 (internal citations, quotations and citations omitted). The Supreme Court has cautioned that, in analyzing the preemptive effect of an agency regulation, "a 'narrow focus on Congress' intent to supersede state law [is] misdirected,'" for "'[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law.'" *Id.* (quoting *de·la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023). Rather, courts should inquire whether the agency intended to preempt state law, and, if so, whether the agency possessed the power to do so. *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023; *see also City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642.

### B.

#### 1.

Having set forth the basic principles that govern preemption, we begin our analysis at the same point as that chosen by the district court. We must consider whether the negative option billing regulation of the FCC is compatible with the provisions of the 1992 Cable Act.

As we have noted above, the Cable Act prohibits cable operators from charging a subscriber "for any service or equipment that the subscriber has not affirmatively requested by name." 47 U.S.C. § 543(f). The FCC's negative option billing regulation reiterates this general prohibition. *See* 47 C.F.R. § 76.981 (1993). However, it also provides that this general prohibition does not apply to the

> addition or deletion of a specific program from a service offering, the addition or deletion of specific channels from an existing tier of service, or the restructuring or division of existing tiers of service that do not result in a fundamental change in the nature of an existing service or tier of service provided that such change is otherwise consistent with applicable regulations.

*Id.; see also* 47 C.F.R. § 76.981(b) (1994).

In determining whether this regulation is a permissible interpretation of the statute, the Supreme Court's analysis in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provides the matrix for our analysis. If the Congress has spoken on the precise question at issue and its intent is clear, "that is the end of the matter." *Id.* at 842, 104 S.Ct. at 2781. Both this court and the FCC are bound by the command of the statute. If the Congress has not spoken directly to the issue and the statute is silent or ambiguous, we do not impose our construction of the statute. Rather, we are obliged to defer to the interpretation of an ambiguous statute by the agency charged with the responsibility for administering it as long as the agency's interpretation is based upon a permissible reading of that statute. *Id.* at 843, 104 S.Ct. at 2781–82.

As the district court noted, the first focus must be the statute itself. Under *Chevron's* first step, the plain language of a statute is the most reliable indicator of congressional intent. *Castellon–Contreras v. INS,* 45 F.3d 149, 153 (7th Cir.1995) (quotation and citation omitted). The statutory language should be conclusive "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Id.* (quotation and citations omitted). Nevertheless, "[a] literal construction is inappropriate if it would lead to absurd results or would thwart the obvious purposes of the statute." *NuPulse, Inc. v. Schlueter Co.,* 853 F.2d 545, 549 (7th Cir.1988) (quotation and citations

omitted). We must employ the "traditional tools of statutory construction" to ascertain whether the Congress had an intention on the precise question at issue. *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. Therefore, we must remember that the "'true meaning of a single section of a statute ..., however precise its language, cannot be ascertained if it be considered apart from related sections[.]'" *Commissioner v. Engle,* 464 U.S. 206, 223, 104 S.Ct. 597, 607, 78 L.Ed.2d 420 (1984) (quoting *Helvering v. Morgan's Inc.,* 293 U.S. 121, 126, 55 S.Ct. 60, 61–62, 79 L.Ed. 232 (1934)). The design of the entire statute can reveal the intent of the Congress. *Sullivan v. Everhart,* 494 U.S. 83, 89, 110 S.Ct. 960, 965, 108 L.Ed.2d 72 (1990); *K–Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988); *Hanson v. Espy,* 8 F.3d 469, 473 (7th Cir.1993).

### 2.

■■■ Upon examination of the statutory section in question, 47 U.S.C. § 543(f), we cannot conclude that the intent of the Congress is so unambiguously stated as to preclude further interpretation by the agency charged with the administration of the statute. The district court was of the view that the terms of the section were unambiguous and interpreted the section as requiring that each "service" be requested "by name." However, the statutory language does not, by its own force, answer the question of whether the unbundling or the mere relabeling of existing services was intended to trigger the statutory obligation to solicit an affirmative request by the customer before the service can continue. A literal interpretation of the statute also would require affirmative marketing to the customer each time a station was substituted—a very burdensome requirement producing significant compliance

costs that would be difficult to reconcile with the contemplated rate regulation scheme.

Structural concerns must also be considered. The Congress' inclusion of this subsection in the section that deals with rate regulation, 106 Stat. 1469; *see* 47 U.S.C. § 543(f), rather than in the section that deals with consumer protection, 106 Stat. 1484, *see* 47 U.S.C. § 552(c), raises an inference that the requirement that an affirmative request be received from the customer was recognized to be at least a factor in the administration of the regulatory scheme for rates.[8]

Having determined that the intent of the Congress is not clear from the bare language of the statute, nor from its structure, we must, consistent with the methodology set forth in *Chevron,* now determine whether the interpretation given the statute by the FCC, the agency charged by the Congress with its administration, is reasonable. If the agency has interpreted the statute in a reasonable manner, that interpretation must prevail. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83.

The regulation in question purports to shield certain alterations in the cable menu, including the one at issue here, from the scope of state consumer protection laws that forbid negative option billing practices. We therefore must determine whether the FCC, in displacing the state consumer protection laws with respect to these practices, has acted within its authority by reasonably interpreting the statutory directive. *See de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023.

### 3.

■■■ To determine whether the FCC reasonably concluded that it was authorized to undertake the preemption contained in its regulations, we must first examine the 1992

---

8. *See Hardin v. City Title & Escrow Co.,* 797 F.2d 1037, 1039 (D.C.Cir.1986) (stating that subtitle "Jurisdiction of Courts," which was part of the statute as enacted by Congress, indicated "Congress's intention that the time limitation [expressed in a particular section within the subtitle] be jurisdictional"); *see also Railway Labor Execs. Ass'n v. Consolidated Rail Corp.,* 666 F.Supp. 1573, 1581 n. 5 (Regional Rail Reorg.Ct. 1987) ("Where a subtitle descriptive of legislation is part of the act, rather than having been added by a compiler or publisher, it is to be taken as an expression of Congressional intent in creating the legislation and may be looked to in interpreting the statute."); *cf. United States v. Castro,* 837 F.2d 441, 442 n. 1 (11th Cir.1988) (noting that title or section heading may not be used to glean legislative intent when it is added by those responsible for codification rather than by Congress).

Cable Act.[9] The 1992 Cable Act expressly preempts state regulation of cable rates. Section 3(a) of the Act states that "[n]o Federal Agency or State may regulate the rates for the provision of cable service except to the extent provided under this section and section 532 of this title." 47 U.S.C. § 543(a)(1).[10] Subsection 543(f), as we have noted above, contains what at least superficially appears to be a categorical prohibition against negative option billing. Notably, this subsection is located in the section of the Act that deals with rate regulation, not in the section dealing with consumer protection. Section 543 must be read, however, in conjunction with another section of the Act that explicitly addresses preemption with respect to state consumer protection laws. Section 8(c)(1) of the statute provides:

Nothing in this title shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this title.

106 Stat. 1484; cf. 47 U.S.C. § 552(c)(1).[11] Previously, this same provision read that state consumer protection laws survived preemption "to the extent not inconsistent with this title." 98 Stat. 2796; cf. 47 U.S.C. § 552(c) (1991) (replacing "title" with "sub-

chapter"). Each version of the statute, but especially the new version, applicable in this case, suggests that Congress envisioned a regulatory regime in which cable operators would be subject both to the federal requirements of the 1992 Cable Act with respect to matters of rate regulation and, at the same time, to the requirements of certain state consumer protection laws.[12] Indeed, the legislative history of the section confirms such a congressional intent: "Section [552(c)(1)] makes it clear that nothing in Title VI is intended to interfere with the authority of a state or local governmental body to enact and enforce consumer protection laws, to the extent that the exercise of such authority is not specifically preempted by the Title." H.R.Conf.Rep. No. 862, 102d Cong., 2d Sess. 1, 78 (1992), reprinted in 1992 U.S.C.C.A.N. 1133, 1231, 1260; see also Time Warner Entertainment Co. v. FCC, 56 F.3d 151, 194–95 (D.C.Cir.1995) (opinion for the court of Rogers, J.) (noting that Cable Act neither expressly preempts state consumer protection laws nor occupies the field).

4.

On the basis of the statutory scheme surveyed in the above section, the FCC decided to treat the statutory negative option billing prohibition as less than a categorical com-

**9.** For a comprehensive survey of the history of federal-state regulatory authority over the cable television industry prior to the 1992 Act, see Cable Television Ass'n of N.Y., Inc. v. Finneran, 954 F.2d 91, 95–98 (2d Cir.1992).

**10.** "Cable Service," the operative term in § 543(a)(1), is defined as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection of such video programming or other programming service." 47 U.S.C. § 522(6). Pursuant to § 543(a)(2)(A), states may regulate rates for the provision of basic cable service, i.e., service tiers that include "the retransmission of local broadcast signals," id. § 522(3), of a cable system that the Commission determines is not subject to "effective competition." Id. § 543(a)(2)(A); see id. § 543(l)(1) (defining manner in which "effective competition" is determined); see also id. § 543(l)(2)(B) (indicating that individually priced channels, as opposed to packages of such channels, are not subject to rate regulation). Section 532, 47 U.S.C. § 532, subjects cable operators to various commercial use requirements. In light of the statutory sec-

tions outlined above, the parties do not dispute that Wisconsin was precluded from regulating the rates Time Warner charged for its à la carte service.

**11.** In the codified version of § 552(c)(1), the word "subchapter" appears in place of the word "title." See 47 U.S.C. § 552(c)(1). However, the Statutes at Large uses the word "title." See 106 Stat. 1484; see also 47 U.S.C.S. § 552(c)(1) (using "title"). "We follow the general rule that in the event of a conflict between the Statutes at Large and the United States Code, the language in the Statutes at Large controls." Time Warner Entertainment Co. v. FCC, 56 F.3d 151, 193 n. 12 (D.C.Cir.1995) (opinion for the court of Rogers, J.) (construing § 552(c)(1)) (citing United States v. Welden, 377 U.S. 95, 98 n. 4, 84 S.Ct. 1082, 1085 n. 4, 12 L.Ed.2d 152 (1964)).

**12.** See American Agric. Movement, Inc., 977 F.2d at 1155 (concluding that existence of preemption savings clause indicates that Congress did not intend to preempt the field and that the existence of both a preemption provision and a savings clause evidences a legislative intent to preempt some, but not all, state regulation).

mand admitting of no exceptions. Its negative option billing regulation, 47 C.F.R. § 76.981, permits some forms of negative option billing. The current version makes explicit the FCC's intent to preempt conflicting state consumer protection laws:

State and local governments may not enforce state and local consumer protection laws that conflict with or undermine paragraphs (a) or (b) of this Section or any other sections of this Subpart that were established pursuant to Section 3 of the 1992 Cable Act, 47 U.S.C. § 543.

47 C.F.R. § 76.981(c) (1994). This version of the regulation was promulgated in December 1994, and thus clearly applies to preemption analyses conducted after that date. However, because the action of Time Warner involved an earlier period, we must also address the earlier versions of the regulation. The Commission's intent with respect to the preemptive effect of 47 C.F.R. § 76.981 as of August 31, 1993 is less clear. The previous version of 47 C.F.R. § 76.981 did not address its preemptive effect within the text of the regulation; the Commission's comments occurred in two brief footnotes.[13] In the process of promulgating its regulations implementing the 1992 Cable Act, the Commission suggested, prior to the time Wisconsin initiated its enforcement action, that state and local laws were preempted to the extent that they regulated alleged negative option billing in a manner inconsistent with the dictates of section 76.981.[14]

The Commission addressed the preemptive effect of its negative option billing rule in more detail in its Third Order on Reconsideration.[15] Despite its mixed signals, the Third Order is best read as the Commission's attempt to clarify its earlier opaque pronouncements on the issue of preemption.[16] In this

13. In *Cable Television Association of New York, Inc. v. Finneran,* 954 F.2d 91 (2d Cir.1992), the Second Circuit expressed concern over finding an intention to preempt in a footnote when there was "no indication that the FCC considered the pre-emptive reach of its statement." *Id.* at 100. In *Finneran,* the footnoted statement addressed a different subsection of the 1984 Cable Act than the subsection whose preemptive effect was at issue, and the footnote, in the court's view, actually had the effect of authorizing, rather than foreclosing, state regulation. *Id.* In contrast, the two footnoted statements in this case addressed negative option billing and, seemingly, had the effect of cabining state regulation. *Cf. City of N.Y.,* 486 U.S. at 65, 108 S.Ct. at 1642–43 (indicating that there was "no room for doubting" that FCC intended to preempt state technical standards governing the quality of cable television signals where, in adopting regulation, FCC clearly referenced its preemptive intent); *de la Cuesta,* 458 U.S. at 158, 102 S.Ct. at 3025 (noting that any ambiguity in regulation's language was dispelled by the preamble accompanying the regulation, which "unequivocally" expressed the agency's intention to displace state law).

14. *See In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Report and Order, and Further Notice of Proposed Rulemaking, 8 F.C.C.R. 5631, 5905 n. 1095 (adopted Apr. 1, 1993, released May 3, 1993) ("Some municipalities argue that state and local governments should have concurrent enforcement powers over negative option billing practices.... We do not preclude state and local authorities from adopting rules or taking enforcement action relating to basic services or associated equipment consistent with the implementing rules we adopt and their powers under state law to impose penalties."); *In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* First Order on Reconsideration, Second Report and Order, and Third Notice of Proposed Rulemaking, 9 F.C.C.R. 1164, 1209 n. 127 (adopted and released Aug. 27, 1993) ("We similarly affirm that franchising authorities may not regulate tier restructuring in a manner that is inconsistent with the 1992 Cable Act.... In particular, local authorities are precluded from regulating negative option billing to prevent tier restructuring regardless of how the local requirement is characterized. The Commission has ruled that cable operators may engage in revenue-neutral tier restructuring without violating the negative option billing procedure.").

15. *In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Buy–Through Prohibition,* Third Order on Reconsideration, 9 F.C.C.R. 4316 (adopted Feb. 22, 1994, released Mar. 30, 1994).

16. Much of the language in the Third Order suggests that it was meant to clarify: *E.g.,* "Language in previous decisions has created confusion," 9 F.C.C.R. at 4359, "our footnotes *may* be construed," *Id.* at 4360 (emphasis added). However, the Commission also stated that it was "substituting the following analysis" for its earlier statements. We also note that the Commission inserted an effective date of May 15, 1994 in the Third Order's ordering clause, even though the Order was issued Mar. 30, 1994. *See id.* at 4373, ¶ 159. There is authority for the proposition that postponement of the effective date of a regulation evinces an intent that it be prospec-

Third Order, the Commission admitted that "[l]anguage in previous decisions in this proceeding has created confusion concerning this issue." 9 F.C.C.R. at 4359. The Commission recognized that, despite their limited analyses, its earlier footnote statements might "be construed as attempting to preempt states ... from regulating negative option billing in a manner inconsistent with our rate regulation rules generally and our specific rule addressing negative option billing." *Id.* at 4360 & nn. 79–80. The Commission then noted that, on its own motion, it had concluded that state and local governments generally could regulate negative option billing under their consumer protection laws, and further noted that it was "substituting" its analysis for the earlier footnoted statements. *Id.* at 4361. The Commission supported its reasoning by analyzing sections 543(a)(1) (preemption of rate regulation), 543(f) (negative option billing prohibition), and 552(c)(1) (consumer protection law savings provision) of Title 47. The FCC determined that the statutory prohibition on negative option billing, 47 U.S.C. § 543(f), was "more in the nature of a consumer protection measure rather than a rate regulation provision *per se.*" Third Order on Reconsideration, 9 F.C.C.R. at 4361. Accordingly, the Commission reasoned, given that the negative option billing prohibition was directed at consumer protection, state and local governments, "by virtue of the preservation of authority" under section 552(c)(1), generally would possess concurrent jurisdiction to regulate negative option billing practices. *Id.* at 4363. The Commission noted, however, that, in light of 47 U.S.C. § 543(a)(1), it would consider the question of federal preemption

in particular cases involving state or local regulation that went beyond consumer protection and instead "approaches actual regulation of rates." Third Order on Reconsideration, 9 F.C.C.R. at 4363. Thus, in its Third Order, the Commission indicated that its negative option billing regulation rarely would be found to preempt state consumer protection laws.[17]

After we heard oral argument in this case, the Commission issued another order, which it describes as "clarifying" its position on preemption. *See Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Sixth Order on Reconsideration, Fifth Report and Order, and Seventh Notice of Proposed Rulemaking, 10 F.C.C.R. 1226 (adopted Nov. 10, 1994, released Nov. 18, 1994). This order, denominated the "Going Forward" order or the "Sixth Order on Reconsideration," set forth a two-part analysis for determining whether federal law and regulation preempts state and local regulation of negative billing practice options. First, the court must determine whether the local negative option rule is consistent with the federal rule. If it is consistent, the local rule may be enforced. If the local rule is inconsistent with the federal rule, however, then a second question must be addressed—whether the local rule undermines the federal regulation. The Commission elaborated: "[S]tate or local consumer protection laws may not be enforced in a manner that conflicts with or undermines our rate regulation rules established pursuant to Section 3 of the 1992 Cable Act." Sixth Order on Reconsideration, 10 F.C.C.R. at 1265.

tive. *See, e.g., Wright v. Director, FEMA,* 913 F.2d 1566, 1572 n. 13 (11th Cir.1990) (noting that postponement of effective date of regulation evinces an intent for prospective application); *accord Criger v. Becton,* 902 F.2d 1348, 1351 (8th Cir.1990); *cf. Yakima Valley Cablevision, Inc. v. FCC,* 794 F.2d 737, 747 (D.C.Cir.1986) (noting same with respect to provisions of 1984 Cable Act). However, 47 C.F.R. § 76.981 is not among the provisions that actually were amended per the order in ¶ 159. *See* 9 F.C.C.R. at 4373. We believe, therefore, that postponement of the effective date does not relate to possible clarification of § 76.981, which was effective September 1, 1993.

**17.** *See Time Warner Entertainment Co.,* 56 F.3d at 194–95 (opinion for the court by Rogers, J.) (noting that the Third Order on Reconsideration treats the negative billing option section of the 1992 Act as a consumer protection provision rather than a rate regulation provision). The court made this comment in the course of deciding that the 1992 Act did not preempt the issue of negative option billing either expressly or by field preemption. Notably, the court did not have before it the issue that we face in this case today—whether the FCC regulation specifically preempts the enforcement of state negative option billing laws in the narrow situation of relatively minor adjustments in programming.

The various pronouncements of the Commission can certainly not be characterized as a seamless garment and we are invited for that reason to forego the usual deference owed to an administrative agency's regulatory interpretation of the statute which the Congress has charged it to administer.[18] Without extended discussion, our colleagues in the District of Columbia Circuit found that the Going Forward Order constituted clarification of the Commission's position and thereby stated the legitimate position of the agency. *Time Warner Entertainment Co.,* 56 F.3d at 195 n. 18 (opinion for the court of Rogers, J.). We cannot disagree with that conclusion. In our view, the various interpretations of the Commission are best viewed as presenting an evolving focus, rather than conflicting pronouncements on the issue of preemption. Accordingly, we view the Commission's pronouncements as clarifying the agency's position, not altering it. *Cf. Pope v. Shalala,* 998 F.2d 473, 483 (7th Cir.1993) (stating that, although substantive rule changes typically may be applied only prospectively, a rule "simply clarifying an unsettled or confusing area of the law ... does not change the law, but restates what the law according to the agency is and has always been," and also noting that "we will defer to an agency's expressed intent that a regulation is clarifying unless the prior interpretation of the regulation or statute in question is patently inconsistent with the later one").

Our review of the FCC's various pronouncements on the issue of preemption reveals, as the statutory structure also suggests, a tension between two policy concerns—federal control of those matters that impact upon the rate structure and state freedom to enforce consumer protection measures in those areas that do not affect the rate structure. Throughout the history of the FCC's multifarious pronouncements, it seems clear that the agency consistently has reconciled this tension by opting for the protection of the rate structure whenever that structure is jeopardized by the application of state consumer protection legislation. We cannot say that this interpretation of section 543(f) is inconsistent with the Cable Act.

What is less clear is *the degree* to which, in the FCC's view, it is necessary to protect the rate structure from the influences of state law. Time Warner notes that a state administrative proceeding to enforce its consumer protection law could have resulted in an order by the State to disgorge revenue it earned under the disputed billing practice. Such an order, Time Warner argues, would set retroactively the rate for its à la carte service at zero. Such action, Time Warner submits, is specifically preempted by 47 U.S.C. § 543(a), and therefore may not be "saved" under 47 U.S.C. § 552(c)(1). As the district court noted, the imposition of such a remedy would indeed be problematic and, although this prospect is no longer a realistic one in this case,[19] we must still consider the potential impact of such a state remedial device in assessing the reasonableness of the federal regulation. Were the State to order Time Warner to turn over all of its receipts from the sale of the à la carte service, Time Warner essentially would have been required to provide the service for free. However, as noted above, the Cable Act prohibits the State from regulating the rates Time Warner charged for this service. Accordingly, the FCC acted reasonably to the extent its regulation preempts the state statutory remedy of disgorgement of the revenue earned under the disputed billing practice.

In its submission as amicus curiae, the FCC suggests that the removal of the possibility that Time Warner will be made to disgorge its profits also removes the threat to the rate structure and, consequently, the need to preempt the state consumer protec-

---

18. *See, e.g., Batanic v. INS,* 12 F.3d 662, 666 (7th Cir.1993) ("When an agency gives inconsistent interpretations of a statute ... those interpretations do not warrant our deference.") (citing *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 2534–35, 115 L.Ed.2d 604 (1991)); *cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

19. In an agreement executed after the litigation in the district court, the parties to this suit have agreed that Wisconsin will not seek such a remedy against Time Warner in any future state administrative proceeding.

tion statute. The FCC also notes that Time Warner already has marketed affirmatively its four-channel package and therefore the marketing costs will not impact further on the rate structure. On the other hand, the Commission does admit that, except for the accident of the post-litigation agreement, the actions taken by Time Warner in this case would fall within the preemptive protection of the FCC's regulation. It points out that in paragraph 118 of its Going Forward Order, 10 F.C.C.R. at 1267, it expressly noted that, in cases not involving a fundamental alteration in the nature of a tier, the transaction costs involved in complying with a state negative option billing prohibition would impact on the rate rules by discouraging the provision of new services at a reasonable cost. Such a state prohibition would act as significant incentive to carriers to freeze service offerings. Local law would in effect set rates by discouraging the addition, deletion or replacement of channels, even when the change worked no fundamental alteration in the nature of the tier.

In our view, the statement of the FCC in its Going Forward Order is a rational expression of the same theme that it has articulated throughout its pronouncements on negative option billing: The rate structure is a federal matter and state consumer laws that impact upon it conflict with the operation of the rate structure. The Commission's litigation position that the post-litigation agreement between the parties in this case somehow negates the protection that otherwise would be afforded to Time Warner is unconvincing. The simple fact of the matter is that the Wisconsin consumer protection statute was preempted at the time that the Wisconsin Attorney General commenced the state action against Time Warner. The FCC's litigation position fails to take into account that Time Warner, at the time it acted, had the right to rely upon the federal regulation that permitted the activity which it undertook. In our view, the actions of Time Warner were, at the time that it took them, permitted by the federal regulation authorizing a limited range of negative option billing whose prohibition by the states would interfere with the execution of the Commission's rate rules. We believe that the federal regulations, to the extent that they preempt state law, are a permissible interpretation of the congressional authority given the FCC in the 1992 Cable Act.

### Conclusion

Accordingly, the judgment of the district court is reversed.

REVERSED.

FERGUSON, Circuit Judge, dissenting.

I dissent from the majority opinion for two reasons. First, the district court and the majority should have abstained from deciding this case, and second, even if the abstention doctrine did not apply, the majority erred in its preemption analysis.

### I.

The dispute between the parties began with an enforcement action filed by the State before the Wisconsin Department of Agriculture, Trade and Consumer Protection. The State charged plaintiff Time Warner with violation of Wis.Stat. § 100.20 (1995), a state consumer protection law which provides in part:

(1) Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

Wis.Stat. § 100.20(1). The State sought to enforce this unfair trade practice statute through an injunction prohibiting Time Warner from continuing its practice of charging existing customers for a la carte channels by a method that the state alleged amounted to negative option billing. Time Warner then filed suit in federal district court to enjoin the state administrative proceeding. In federal court, Time Warner argued that the Wisconsin statute was preempted by a Federal Communications Commission ("FCC") regulation and that Wisconsin's attempt to regulate Time Warner's conduct violated the federal 1992 Cable Television Consumer Protection and Competition Act.

Under these circumstances, the district court was required to abstain from deciding

Time Warner's claim pursuant to *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This Court recently described the importance of the *Younger* abstention doctrine in *Trust & Investment Advisers, Inc. v. Hogsett*, 43 F.3d 290 (7th Cir.1994), when it stated that the most important reasons for applying the *Younger* abstention doctrine are "the notions of comity and federalism at the heart of our nation's delicate balancing act." *Id.* at 294. The *Younger* abstention doctrine requires a federal court to pay careful attention to the interests of the state in order to protect those interests.

Comity may even require a federal court to recognize the state's interest *sua sponte* and to apply abstention principles, including a *Younger* abstention, when the attorney general may not have recognized the need to do so. *Bellotti v. Baird*, 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 2864 n. 10, 49 L.Ed.2d 844 (1976) ("[I]t would appear that abstention may be raised by the court *sua sponte.*"); *Waldron v. McAtee*, 723 F.2d 1348, 1350 (7th Cir.1983) (abstaining pursuant to *Pullman*, stating "the court has the power and in an appropriate case the duty to order abstention, if necessary for the first time at the appellate level, even though no party is asking for it."); *O'Neill v. City of Philadelphia*, 32 F.3d 785, 786 n. 1 (3d Cir.1994) (citing *Bellotti* in support of its statement that "[e]ven though the question of *Younger* abstention was not raised by the parties on appeal, we may consider it *sua sponte.*"), *cert. denied*, —— U.S. ——, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995). Unlike other forms of abstention, which vest the district court with discretion to decline jurisdiction, a *Younger* case proscribes discretion and requires the district court to abstain. *Hogsett*, 43 F.3d at 294.

The *Younger* abstention doctrine applies equally to state administrative proceedings that are judicial in nature and that implicate important state interests. *See Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (*Younger* abstention applied in light of a state lawyer disciplinary proceeding); *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (*Younger* abstention applied in light of a proceeding before a state civil rights commission); *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367–68, 109 S.Ct. 2506, 2517–18, 105 L.Ed.2d 298 (1989) (*Younger* abstention appropriate where an important state interest is implicated).

In *Hogsett*, this Court adopted a three-part test to determine the applicability of the *Younger* abstention doctrine: 1) are there ongoing state judicial proceedings; 2) do the proceedings implicate an important state interest; and 3) is there an adequate opportunity in the state proceeding to raise constitutional challenges? *Hogsett*, 43 F.3d at 295. If so, the district court must abstain from deciding the controversy. *Id.* at 294.

The first part of the test is easily satisfied here. The state proceedings have not been resolved before the Wisconsin state agency, nor have they been reviewed by the state courts. As for the second part of the test, there are few state interests that are more important or more clearly within the proper control of the state than consumer protection. *See, e.g., California v. ARC America Corp.*, 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989) ("Given the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the states."). In contrast to free speech and other cases involving federal rights, the protection of consumers falls within the traditional police power of the state. *Id.* One indicator of the importance of the state interest in protecting consumers is the fact that the state's attorney general instituted the state proceeding and was the named defendant in the federal suit. *See Middlesex County Ethics Comm.*, 457 U.S. at 434–35, 102 S.Ct. at 2522–23. The district court and the majority have failed to consider the substantiality of the state's interest in the generic proceedings in this case.

In addition to the substantial impact on consumer protection caused by Time Warner's practice of billing its customers for a la carte services, this practice also strongly im-

plicates traditional contract law. When Time Warner agrees to provide cable television services to a customer, Time Warner forms a contract with the customer to provide enumerated services. Time Warner's alteration of its billing scheme is potentially a violation of the contract and the terms as provided therein. These basic contract considerations are also best protected by the state in its protection of consumers as well as in its regulation of the enforcement of contracts formed within its jurisdiction.

Important considerations of comity and federalism are raised in this case, but the district court and the majority fail to consider them. The state's broad interest in protecting consumers by enjoining what it adjudicates to be unfair trade practices should not be so easily limited by the federal courts, particularly when that interest is being developed in an ongoing proceeding. As this Court has acknowledged, " 'the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always [must] endeavor[ ] to do so in ways that will not unduly interfere with the legitimate activities of the States.' " *American Federation of State, County, and Municipal Employees v. Tristano*, 898 F.2d 1302, 1304 (7th Cir.1990) (quoting *Younger*, 401 U.S. at 44, 91 S.Ct. at 750–51). In this case, the district court should have balanced the state's interest in protecting its consumers through enforcement of its consumer protection statute against the federal interest in determining the preemptive effect of a federal regulation. Had the district court properly weighed these interests, it would have understood that the state's interest clearly can, and in this case, does outweigh the federal interest in resolving the potential preemption question. *See New Orleans Public Service*, 491 U.S. at 365, 109 S.Ct. at 2516–17 (holding that the federal interest in enforcing the Supremacy Clause did not outweigh the state's interest in regulating its utilities).

Finally, the third part of the *Younger* test is also resolved in favor of abstention in this case. Whether the Wisconsin Department of Agriculture, Trade & Consumer Protection will be able to or will chose to decide the constitutional issues that may arise in this case has yet to be determined. However, the critical fact for the purposes of the *Younger* abstention doctrine is *whether* a party has an adequate *opportunity* to raise constitutional challenges. The Wisconsin statute itself provides for judicial review of the Wisconsin agency's actions. Wis.Stat. § 100.20(4) (citing the Wisconsin Administrative Procedure Act, Wis.Stat. § 227 (1995)) (section 227.52 provides for judicial review of administrative decisions adversely affecting the substantial interest of any party). Therefore, the third prong of the *Younger* test is satisfied.

Even were the district court to have found that it was not required to abstain in this case pursuant to *Younger*, the district court nevertheless had the discretion to abstain. The district court should have exercised its discretion and abstained on the basis of *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). As this Court has previously held, "[t]he main purpose of the *Pullman* doctrine is to avoid, if possible, declaring a state statute unconstitutional, by giving the state courts a chance to interpret it narrowly." *Mazanec v. North Judson–San Pierre School Corp.*, 763 F.2d 845, 847 (7th Cir.1985). *Pullman* abstention may be applied so long as two requirements are met: 1) there is some risk that the state statute will be found unconstitutional unless narrowed; and 2) there is some reasonable chance that the state statute can be narrowed through interpretation. *Id.* The Supreme Court has applied *Pullman* abstention where the preemptive effect of a federal law could have been avoided or limited by a narrow interpretation of the state statute. *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 512, 92 S.Ct. 1749, 1758, 32 L.Ed.2d 257 (1972) (holding that the district court should have abstained pursuant to *Pullman* in order to allow the state courts to resolve ambiguities in the state law that were sufficiently likely to modify the federal questions, including preemption, raised by the appellants).

Indeed, in this case the *Pullman* abstention is clearly applicable precisely because the FCC regulation will have no preemptive effect if the Wisconsin agency interprets the state statute narrowly. Thus both of the

*Pullman* requirements are satisfied. First, there is some risk that the Wisconsin consumer protection statute will be found to be unconstitutional if the state applies it in the face of a preemptive FCC regulation. *See MacMullan,* 406 U.S. at 512, 92 S.Ct. at 1758. Second, there is a reasonable chance that the Wisconsin Department of Agriculture, Trade & Consumer Protection will interpret the consumer protection statute narrowly enough that it will have no impact on cable rate-setting or on the other subject matter of the 1992 Cable Television Consumer Protection and Competition Act or the FCC regulation.

Moreover, the Wisconsin agency may determine that the Wisconsin statute is either invalid or that it is not violated in this particular circumstance. Just as in *MacMullan,* the state agency's determinations in this matter could completely modify or render moot the federal questions raised by Time Warner. *MacMullan,* 406 U.S. at 512, 92 S.Ct. at 1758. The district court should have abstained in order to allow the state proceedings to resolve this controversy through its interpretation of the state statute.

## II.

In addition to failing to abstain in this case, the majority have also erred in holding that the Wisconsin consumer protection statute is preempted by the 1992 Cable Act and its derivative FCC regulations.

The majority conclude that the Wisconsin law is preempted because the consumer protection law in issue will affect the rate structure of cable services. This argument is not only contrary to established law, but it also elevates form over substance.

The Supreme Court has consistently imposed a strong presumption against preemption.

> Consideration of issues arising under the Supremacy Clause 'start with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). In its most recent decision on preemption, the Supreme Court rejected a broad reading of the seemingly expansive term "relate[s] to" as potentially unbounded. *N.Y. State Conference of Blue Cross v. Travelers Ins.,* — U.S. —, —, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995). Nevertheless, the majority here argues that "the transaction costs involved in complying with a state negative billing prohibition [will] impact on the rate rules by discouraging the provision of new services at a reasonable cost," *supra* at 882. This reasoning, taken to its logical end, is also potentially unbounded as it results in all state consumer laws being classified as "rate structures." Such an interpretation would require all consumer protection laws to be preempted since all such regulation potentially affects cable rates—albeit indirectly. Such an expansive interpretation has already been rejected under the Cable Communications Policy Act of 1984 and need not be revived. *See Cable Television Ass'n v. Finneran,* 954 F.2d 91 (2d Cir.1992) (holding that a statute that preempts "regulation of rates" does not preempt state regulation of matters that may affect cable rates indirectly).

Here, the federal preemption question is resolved by the terms of the statute. The Act provides that:

> [a] cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name.

47 U.S.C. § 543(f). There is no dispute that the term "service" includes each of the individual channels that were "unbundled" in this case. Despite the plaintiff's claim that the subscriber "affirmatively requested" the a la carte channels by agreeing to the original cable package, the fact remains that the subscriber never requested the "unbundled" channels "by name," as the statute requires. The Cable Act provides that before any subscriber receives any individual channel, the subscriber must affirmatively request that channel "by name." Subscribing to a general package of cable channels is not requesting each of those channels "by name."

The statutory language is unambiguous and, as a result, there is no need to examine the reasonableness of the interpretation given to the statute by the FCC. The plain meaning of the language of the 1992 Cable Act establishes that the Wisconsin consumer protection law is not preempted.