M & I Marshall & Ilsley Bank,
Plaintiff-Appellant,

v.

Guaranty Financial, MHC, Guaranty Bank,
GBRC Holding Company and GB REIT
Corporation, Defendants-Respondents.

Court of Appeals

*No. 2010AP729. Oral argument December 14, 2010.
—Decided May 5, 2011.*

2011 WI App 82

(Also reported in 800 N.W.2d 476.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Daniel J. Vaccaro* and *Joseph Louis Olson* of *Michael Best & Friedrich LLP*, Milwaukee. There was oral argument by *Daniel J. Vaccaro*.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Kevin L. Keeler* and

*Mathew S. Vignali* of *Beck, Chaet, Bamberger & Polsky, S.C.,* Milwaukee. There was oral argument by *Kevin L. Keeler.*

Before Vergeront, P.J., Sherman and Blanchard, JJ.

¶ 1. BLANCHARD, J. M&I Marshall & Ilsley Bank appeals a circuit court order dismissing M&I's state law claims on federal preemption grounds. M&I's state law claims sought to reverse an exchange of shares of stock between defendant Guaranty Bank and defendant GB REIT on the grounds that the stock exchange amounted to fraudulent transfer and conversion of M&I assets pledged as collateral for a loan made by M&I to the defendant entities.[1] The collateral for the loan was the GB REIT preferred shares, which were more valuable than the Guaranty Bank preferred shares.

¶ 2. Preemption became an issue because a federal regulatory agency directed the exchange of stock that M&I challenges in this action. The federal directives required the defendants to make the exchange for the purpose of increasing the capitalization of Guaranty Bank. The circuit court concluded that this law suit, in which M&I seeks to reverse the exchange, is preempted by the directives.

¶ 3. M&I acknowledges that relief it seeks, including an order that would void the stock exchange, would

---

[1] For ease of reference, we sometimes use the collective term "defendants" to refer to events that may have directly involved fewer than all of the four defendant entities in this case, but where it does not matter to the issue under discussion which defendants were directly involved. As the parties have presented the issues in this appeal, there is a complete identity of interest among the defendants. In other instances, where it could matter for the sake of clarity, we name the particular defendant or defendants involved in the point under discussion.

directly conflict with the federal agency directives. However, M&I contends that conflict preemption does not apply for three reasons: (1) the agency directives purporting to trigger the stock exchange were not valid, because the exchange was not permitted under the REIT's certificate of incorporation, due to an unfulfilled alleged condition precedent in the certificate; (2) the only federal regulation on which the agency could base its preemptive authority creates preemptive power solely for actions of the agency related to savings association "operations" not at issue in this case; and (3) even if the federal regulation provided preemptive authority, the directives lacked preemptive effect because they were not enforceable orders.

¶ 4. We conclude that the agency directives were not invalid due to the alleged condition precedent in the REIT's certificate of incorporation, that the federal regulation at issue created preemptive authority for the directives, and that the directives carried the force of federal law relevant for preemption purposes. Accordingly, we affirm the circuit court's order dismissing the complaint on preemption grounds, and do not reach additional arguments made by the defendants for dismissal of M&I's complaint.

## STANDARD OF REVIEW

¶ 5. "A motion to dismiss a complaint for failure to state a claim tests the legal sufficiency of the complaint." *Watts v. Watts,* 137 Wis. 2d 506, 512, 405 N.W.2d 303 (1987). This presents a question of law for our independent review. *Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis. 2d 235, 245, 593 N.W.2d 445 (1999). We accept facts alleged in the complaint as true, drawing from those facts all reasonable inferences favor-

ing a claim. *Meyer v. Laser Vision Inst., LLC*, 2006 WI App 70, ¶ 3, 290 Wis. 2d 764, 714 N.W.2d 223. "A complaint should not be dismissed for failure to state a claim unless it appears certain that no relief can be granted under any set of facts that a plaintiff can prove in support of [the] allegations." *Watts*, 137 Wis. 2d at 512.

[5, 6]

¶ 6. The following rule regarding attachments to complaints is also relevant:

> When a document is attached to the complaint and made a part thereof, it must be considered a part of the pleading, and may be resorted to in determining the sufficiency of the pleadings. When the allegations of a pleading are inconsistent with the terms of a document attached as an exhibit, the terms of the document fairly construed, prevail over averments differing in the complaint.

*Friends of Kenwood v. Green*, 2000 WI App 217, ¶ 11, 239 Wis. 2d 78, 619 N.W.2d 271 (citations omitted).

¶ 7. Thus, our factual summary and the discussion that follows are limited to consideration of: (1) allegations of fact contained in M&I's complaint; (2) allegations of fact reflected in exhibits attached to the complaint; and (3) all reasonable inferences arising from these allegations supporting M&I's claims, so long as an allegation in the complaint is not contradicted by the terms of an exhibit attached to the complaint.

## BACKGROUND

### *M&I Loan to MHC Secured by REIT Stock*

¶ 8. Under a March 30, 1998, loan agreement and its subsequent amendments, M&I loaned, over time, a total of $50 million to Guaranty Financial, MHC (MHC), then a Wisconsin mutual savings bank. As collateral security for its obligations under the loan agreement,

181

MHC pledged 50,000 shares of preferred stock of the GB REIT Corporation. The REIT[2] was a wholly owned subsidiary of GBRC Holding Company, which was in turn a wholly owned subsidiary of Guaranty Bank. Guaranty Bank, in turn, was a wholly owned subsidiary of Guaranty Financial Corp., which was owned 52 percent by MHC.

¶ 9. As M&I provided loan proceeds under the agreement, the defendants used the proceeds to purchase the REIT preferred stock, and then pledged to M&I as collateral this REIT stock, transferring certificates for one share of the REIT stock for each $1,000 of principal loan balance, because the liquidation value of each share of REIT stock was $1,000. In this way, the defendants granted to M&I a lien on the pledged REIT preferred shares having a total liquidation value of $50 million.

### Automatic Exchange Provisions

¶ 10. The REIT preferred shares purchased with the loan proceeds that served as collateral, as described above, were subject to a potential "automatic exchange" of shares. Pursuant to provisions of the REIT certificate of incorporation filed with the State of Delaware,[3] the REIT shares would be automatically exchanged for

---

[2] While details of the operations of the REIT in this case are not relevant to this appeal, as a general matter a REIT is a real estate investment trust, a corporate entity required to possess real estate interests and designed to create corporate income tax advantages. *See* 26 I.R.C. § 856 (2009). In this case, the REIT assets included residential mortgages and home equity loans.

[3] The REIT filed an original certificate of incorporation on March 13, 1998, a first restated certificate of incorporation on March 30, 1998, and a third restated certificate of incorporation

Guaranty Bank preferred shares under specified circumstances. Those circumstances would trigger an "Exchange Event," which would occur whenever the "appropriate regulatory agency directs in writing (a 'Directive')" that there be an exchange because of any of three events:

1. Guaranty Bank "becomes 'undercapitalized' under prompt corrective action regulations";

2. Guaranty Bank "is placed into conservatorship or receivership"; or

3. "[T]he appropriate regulatory agency, in its sole discretion, anticipates" Guaranty Bank "becoming 'undercapitalized' in the near term (the 'Exchange Event')."

The Exchange Event would occur in the following manner. Each holder of the REIT preferred stock would be obligated to surrender to Guaranty Bank the certificates representing each share of the holder's REIT preferred stock, and Guaranty Bank would be obligated to issue in exchange, on a one-to-one ratio, shares of Guaranty Bank's preferred stock.

### *Guaranty Bank Converts to Federal Savings Bank Status*

¶ 11. Federal preemption arises as an issue in this case because in 2002, MHC and Guaranty Bank converted to federal charters, although details of the conversions are not a focus of this appeal. M&I consented

on February 9, 2001. The provisions relevant to this appeal are identical in each certificate, and for ease of reference we will refer to the REIT certificate of incorporation as if it were a single document, except where reference to individual filings is necessary to the discussion.

to these conversions in an amendment to the loan agreement. Guaranty Bank became a federal "thrift institution" by surrendering its Wisconsin charter in exchange for a federal stock saving bank charter, and MHC, as a federal mutual holding company, became the parent company of Guaranty Financial Corp., which was the parent of Guaranty Bank.

### OTS Issues Cease and Desist Orders; M&I Demand

¶ 12. On March 11, 2009, the Office of Thrift Supervision (OTS), the federal agency with regulatory authority over federal savings banks, issued orders directing MHC, Guaranty Financial Corp., and Guaranty Bank to cease and desist from certain actions and to undertake other actions to address "diminished capital levels, poor earnings, [a] high level of classified assets, and inadequate policies and procedures."

¶ 13. These cease and desist orders constituted default events under the M&I loan agreement. In a separate default event under the loan agreement, MHC failed to make its March 31, 2009, quarterly interest payment on the loan to M&I. Citing these defaults, on April 6, 2009, M&I demanded repayment of the $50 million in loan proceeds that it was owed, and informed MHC that it intended to sell, in one or more private sales, the 50,000 shares of GB REIT preferred stock pledged as security under the loan.

### OTS Issues Directive for Automatic Exchange

¶ 14. On April 24, 2009, OTS issued two similarly worded directives, one to Guaranty Bank and the other to the REIT. The texts of the directives are recited in full in the discussion below in ¶¶ 56, 57. They directed

184

the defendants to make the automatic exchange of the REIT preferred shares for Guaranty Bank preferred shares, because OTS "anticipates the Bank becoming 'undercapitalized' under Prompt Corrective Action regulations, 12 C.F.R. Part 565, in the near term." OTS directed: "The Automatic Exchange shall be effective at 8:00 a.m. Milwaukee time on Tuesday, April 28, 2009."

¶ 15. The defendants made the exchange on April 28, 2009, and Guaranty Bank notified M&I that, pursuant to direction from OTS, Guaranty Bank was dissolving and liquidating both the REIT and GBRC Holding Company, so that all assets of the REIT and GBRC were distributed to Guaranty Bank.

### M&I's State Law Claims

¶ 16. M&I alleges that at the time of the automatic exchange, the REIT's assets were worth more than $62 million, and its preferred stock had a liquidation value of $1,000 per share. In contrast, M&I alleges, the Guaranty Bank preferred stock was of little or no value, and therefore the automatic exchange had the effect of depriving M&I of approximately $50 million. More specifically, M&I alleges that the automatic exchange was a fraudulent transfer under both WIS. STAT. §§ 242.04(1)(b) and 242.05(1) (2009–10). M&I's conversion claim is that the defendants "took, and caused to cease to exist, 50,000 shares of GB REIT Preferred Stock in which M&I had a valid, fully perfected first priority security interest."[4] Relief sought by M&I in-

---

[4] M&I's complaint in this action included a breach of contract claim, in addition to the fraudulent transfer and conversion claims. The circuit court entered summary judgment against MHC and awarded M&I $53,118,105.14 on the

cludes voiding the automatic exchange and appointing a receiver to take charge of the assets of the REIT.

### *Circuit Court Decision*

¶ 17. The circuit court granted the defendants' motion to dismiss both the fraudulent transfer and conversion claims on the grounds that the relief sought by M&I directly conflicts with the goal of the OTS directives to make the automatic stock exchange, and that the defendants had no choice but to comply with the directives.

### *Regulation by OTS*

¶ 18. As final background for our discussion, we briefly describe the specific federal statutory and regulatory framework at issue.

¶ 19. When Congress enacted the Home Owners' Loan Act of 1933 (HOLA), now found at 12 U.S.C. § 1461–70 (2009),[5] it created the Federal Home Loan Bank Board to regulate federally chartered savings associations. In 1989, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), which restructured the regulation of the savings association industry by abolishing the Bank Board and vesting many of its functions into the newly created OTS. FIRREA, Pub. L. No. 101–73, §§ 301, 401, 103 Stat. 183 (1989) (codified in scattered sections of 12

---

breach of contract claim, based on MHC's default under the loan agreement. This summary judgment was not opposed by MHC and is not at issue in this appeal.

[5] All references to United States Code are to the 2009 version.

U.S.C.). As a result, pursuant to HOLA and FIRREA, OTS has plenary authority to promulgate regulations involving the operation of federal savings associations. *See State Farm Bank, FSB v. Reardon*, 539 F.3d 336, 342 (6th Cir. 2008); 12 C.F.R. § 500.1(a) (2009).[6] Pursuant to HOLA, OTS is charged with responsibility for "the examination, safe and sound operation, and regulation of savings associations," 12 U.S.C. § 1463(a)(1), and has broad discretion to promulgate regulations "appropriate to carry out [its] responsibilities." 12 U.S.C. § 1463(a)(2). The authority of OTS is summarized at 12 U.S.C. § 1464:

### (a) In general.

In order to provide thrift institutions for the deposit of funds and for the extension of credit for homes and other goods and services, the Director [of OTS] is authorized, under such regulations as the Director may prescribe—

(1) to provide for *the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings associations (including Federal savings banks),* and

(2) to issue charters therefor,

*giving primary consideration of the best practices of thrift institutions in the United States.* The lending and investment powers conferred by this section are intended to encourage such institutions to provide credit for housing safely and soundly.

(Emphasis added).

---

[6] All references to the Code of Federal Regulations are to the 2009 version.

## DISCUSSION

¶ 20. We first summarize the basic law of preemption, and then address M&I's arguments that preemption does not apply in this case.

### A. Preemption Law

¶ 21. "[S]tate law that conflicts with federal law is 'without effect,' " under the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (citation omitted). "Federal preemption of a matter deprives a state court of subject matter jurisdiction." *Dykema v. Volkswagenwerk AG*, 189 Wis. 2d 206, 210, 525 N.W.2d 754 (Ct. App. 1994). The preemptive effect of a federal law generally presents a question of law. *See Miller Brewing Co. v. DILHR*, 210 Wis. 2d 26, 33, 563 N.W.2d 460 (1997).

¶ 22. While Congress has authority to preempt state law, "analysis of preemption claims begins with the presumption that 'Congress does not intend to supplant state law.' " *Miezin v. Midwest Express Airlines, Inc.*, 2005 WI App 120, ¶ 9, 284 Wis. 2d 428, 701 N.W.2d 626 (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)). Thus, courts are to " 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) (citation omitted).[7]

---

[7] We note authority for the proposition that "courts will not apply a presumption against preemption when analyzing

██ ¶ 23. Federal preemption of state laws occurs in three circumstances: (1) Congress explicitly states its intention to preempt state law; (2) a federal statutory

federal banking statutes," because they are " 'so pervasive as to leave no room for state regulatory control.' " *Munoz v. Financial Freedom Senior Funding Corp.*, 567 F. Supp. 2d 1156, 1159 (C.D. Cal. 2008) (citation omitted) (addressing claim that HOLA preempted state consumer fraud claims against lender). *Munoz* explained that this is an application of a general rule that the presumption does not apply " 'when [a] state regulates in an area where there has been a history of significant federal presence.' " *Id.* (alteration in original) (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). Federal courts have observed that the Bank Board's authority, and now the authority of OTS, to regulate federal savings and loans is virtually unlimited and "[p]ursuant to this authorization, the [Bank] Board has promulgated regulations governing 'the powers and operations of every Federal savings and loan association *from its cradle to its corporate grave.*' " *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 145 (1982) (emphasis added; citation omitted); *id.* at 161 (also noting, "[i]t would have been difficult for Congress to give the Bank Board a broader mandate") (alteration in original; citation omitted; internal quotations marks omitted). As one federal district court has noted,

> [C]ourts have held that the regulatory control of OTS and its predecessor, the Federal Home Loan Bank Board, over federal savings and loan associations is so pervasive as to leave no room for state regulatory control . . . . [T]he broad regulatory authority over federal associations conferred upon the Bank Board by HOLA does wholly pre-empt the field of regulatory control over these associations . . . .

*State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207, 218 (D. Conn. 2006) (citation omitted; internal quotation marks omitted). However, as discussed below, even applying the traditional presumption against preemption and limiting our analysis to conflict preemption, each of M&I's specific contentions on appeal is without merit.

or regulatory scheme shows intent to occupy the field to the exclusion of state law; (3) operation of state and federal law actually conflict. *English v. General Elec. Co.*, 496 U.S. 72, 78–79 (1990); *Miezin*, 284 Wis. 2d 428, ¶ 10 (summarized as express preemption, implied field preemption, and implied conflict preemption).

¶ 24. Preemption is not limited to the effect of federal statutes, but also can be created by federal regulations promulgated by federal agencies. The supremacy clause gives Congress authority not only to enact legislation that expressly or has the effect of preempting state law, but also to delegate the same authority to an executive agency. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54 (1982); *see also Time Warner Cable v. Doyle*, 66 F.3d 867, 875–76 (7th Cir. 1995) (agency may preempt state law through regulations within scope of its delegated authority, so long as agency action not arbitrary).

¶ 25. The parties in this case agree, and the circuit court below concluded, that what is at issue here is implied conflict preemption. This form of preemption will be found "when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *de la Cuesta*, 458 U.S. at 153 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Conflict preemption occurs "to the extent that there is an actual conflict between federal and state law." *Hazelton v. State Personnel Comm'n*, 178 Wis. 2d 776, 787, 505 N.W.2d 793 (Ct. App. 1993) (citing *Mortier*, 501 U.S. at 605). "A conflict will arise when compliance with both the federal and state laws is a physical impossibility or when a state law is a barrier to

the accomplishment and execution of Congress objectives and purposes." *Hazelton*, 178 Wis. 2d at 787 (citing *Mortier*, 501 U.S. at 605).

¶ 26. Turning to M&I's arguments against preemption here, as mentioned above M&I does not dispute that the remedies it seeks would reverse the automatic stock exchange directed by OTS. That is, M&I acknowledges that the defendants could not have complied with the OTS directives without engaging in the conduct that M&I alleges constituted fraudulent transfer and conversion.

¶ 27. Further, M&I does not challenge the broad authority of OTS to take formal actions related to the activities of the defendants, at the time it issued the challenged directives, that would have preemptive power. Instead, M&I makes narrow arguments that rest in part on the notion that OTS was operating under a "misapprehension" about what it could accomplish at the time it issued the directives.

¶ 28. First, M&I points to an alleged unfulfilled condition precedent in the REIT certificate of incorporation. We address this contention in Section B. below. Second, M&I challenges both the authority of OTS to issue the directives and the preemptive force of the directives. We address these two contentions in Section C. below.

### B. Authority for the Stock Exchange under the REIT Certificate of Incorporation

¶ 29. M&I argues that there could be no preemption based on the OTS directives, because the exchange was not authorized under Section 4.1(d)(1) of the REIT certificate of incorporation. Under this view, alleged in M&I's complaint, Section 4.1(d)(1) contains an "express

191

condition precedent" requiring that Guaranty Bank file with the State of Wisconsin a certificate of designation establishing its preferred shares on or before March 31, 1998, in order to trigger the potential for the exchange. M&I argues that by allegedly waiting more than two months, until June 5, 1998, to file amended and restated articles of incorporation establishing its preferred stock, Guaranty Bank violated a necessary precondition to the automatic exchange, and therefore the exchange was not an option at the time OTS issued its directives. This argument does not address the preemptive authority of OTS. Instead, M&I asserts that under the governing documents the exchange was simply not possible at the time OTS directed that it occur.

¶ 30. We assume without deciding that, if the automatic exchange was not possible when OTS purported to trigger it, then the OTS directives in themselves lacked preemptive effect. However, for the following reasons we conclude that, under the only reasonable construction of Section 4.1(d)(1), when read properly in the context of the terms of the loan agreement, Section 4.1(d)(1) did not prohibit the exchange as M&I asserts.

¶ 31. Section 4.1(d) of the REIT certificate of incorporation addresses the automatic exchange. At issue here is its first subsection, which states in relevant part:

> (1) *After March 31, 1998,* subject to the terms and conditions of this Section 4, each share of [GB REIT] Preferred Stock will be exchanged automatically (the "Automatic Exchange") for one share of . . . Preferred Stock, . . ., $1.00 par value per share (a "Bank Preferred Share"), of Guaranty Bank, S.S.B. (the "Bank"), *if on or prior to March 31, 1998,* the Bank shall have filed with the State of Wisconsin Department of Financial Institutions a Certificate of Designation establishing the

192

[Guaranty] Bank Preferred Shares . . . . *The [REIT] Preferred Stock may not be so exchanged, and the [Guaranty] Bank Preferred Shares may not be so issued, prior to March 31, 1998 or if a Certificate of Designation is not so filed.*

(Emphasis added).

¶ 32. M&I focuses narrowly on the phrase "if on or prior to March 31, 1998, the Bank shall have filed," which MI submits means that an automatic exchange may never occur unless Guaranty Bank filed its certificate of designation by that date, absent an amendment to REITs certificate of incorporation focused on this alleged condition precedent.

¶ 33. However, we conclude that, when read in its entirety and in the context of the loan agreement with which the REIT incorporation is associated, Section 4.1(d) has only one reasonable interpretation, namely that the exchange may occur, after March 31, 1998, but only after the certificate of designation is first filed with the state.

¶ 34. We look first at the terms of Section 4.1(d) itself, and then turn to its meaning in the context of the loan agreement. Read as a whole, Section 4.1(d) establishes that the exchange may not occur until after the filing of the certificate of designation establishing the Guaranty Bank preferred shares, which is anticipated to occur on or around March 31, 1998. The second sentence of Section 4.1(d), and in particular its final phrase, or if a Certificate of Designation is not so filed, makes sense only if the date, March 31, 1998, is viewed as a marker for ongoing activity, not as a drop dead deadline for the filing of the certificate if the exchange is ever to occur.

¶ 35. It is true that the phrase "if on or prior to March 31, 1998," if read in complete isolation, suggests a

193

condition precedent. However, courts and parties are not to interpret phrases in texts in complete isolation. MI advances only one alternative interpretation, the express condition precedent interpretation, and it is untenable as discussed above.

¶ 36. The defendants' construction of Section 4.1(d) is further supported by M&I's concession on appeal that, under the terms of the certificate of incorporation, the REIT continuously had authority to amend that document until the time the REIT was dissolved. Therefore, the REIT could have, at any time up to the time of the OTS directives, excused Guaranty Bank's allegedly tardy filing of the certificate of designation and permitted the automatic exchange. It is not a tenable interpretation of Section 4.1(d)(1) that the REIT barred itself from reliance on the critical exchangeability feature in the event of the tardy filing of the certificate of designation, even though the REIT could retroactively deem the filing to be "not tardy" at any time. There would have been no point to creating such a condition precedent.

¶ 37. Turning to the loan agreement, three aspects of the agreement support our interpretation of Section 4.1(d) as the only reasonable one. First, the timing of events set forth in the agreement make clear that Section 4.1(d) meant that if on or prior to March 31, 1998, the bank shall have filed a certificate of designation, then after that date the stock is exchangeable. The loan agreement is dated March 30, 1998, and the REIT's first restated certificate of incorporation was filed with the Delaware Secretary of State on the same day. The "closing date" for the transaction was defined to be March 30, 1998. Bearing this timing in mind, it is evident that Section 4.1(d) begins with the phrase, "After March 31, 1998," and references that

date several times thereafter, for the purpose of establishing a starting point for the transaction as a whole, moving forward from March 31, 1998, the day following the closing date.

¶ 38. Second, a central feature of the loan agreement was that Guaranty Bank could count the REIT preferred stock in its bank capital through the potential for the stock exchange. This conversion feature was integral to the transaction. As M&I acknowledges on appeal, by its terms the loan agreement establishes that a primary purpose of incorporating the REIT was to effectuate the loan agreement, so that the real estate investment trust could generate returns from the $50 million loan. Further, M&I acknowledges on appeal that the automatic exchange was a required feature of the loan agreement, under federal regulations, from the inception of the REIT and the loan agreement.[8] Thus, from the inception of the REIT and the loan transaction that the REIT was created to make productive use of,

---

[8] As M&I acknowledges, the exchangeability feature allowed Guaranty Bank to count a portion of the REIT's assets as part of its "tier one" capital, which was necessary under the federal regulations. See 12 C.F.R. 567.5 n.4 (capital of savings association cannot include preferred stock of subsidiary that is collateralized by assets of subsidiary). The loan agreement includes the commitment of Guaranty Bank, as the borrower, to obtain "all regulatory approvals necessary to consummate the loan transaction and pledges of collateral contemplated by the Loan Agreement and the Collateral Documents." "Collateral documents" are defined to include the REIT preferred stock pledged to M&I as collateral. Similarly, Guaranty Bank committed under the loan agreement to remain a "well capitalized" savings bank under federal regulations and to promptly notify M&I of its awareness of the commencement of any investigation, litigation, or administrative or regulatory proceeding that could adversely affect Guaranty Bank or the REIT.

the transaction depended in part on the fact that the REIT's assets, while pledged as collateral to M&I, were "automatically" available to the bank through the exchange, if deemed necessary by OTS due to capitalization concerns.

¶ 39. For these reasons, it would have run directly counter to a primary goal of the parties—ensuring that Guaranty Bank could, if necessary, count the preferred stock in its bank capital through availability of the automatic exchange—for the REIT's own certificate of incorporation to easily destroy this essential purpose. That is to say, in light of the structure of the loan transaction, it would have made no sense to have placed the exchange in easy jeopardy through a condition precedent requiring designation of the Guaranty Bank preferred shares by March 31, 1998, and not one day later. The certificate had to be filed before the exchange could occur, and all parties were aware that the exchange needed to be available promptly, because the transaction depended in part on the exchangeability feature. Guaranty Bank was at risk of significantly overstating its capital each day that the exchangeability feature was not in place.

¶ 40. A third relevant aspect of the loan agreement is that neither it nor the REIT certificate of incorporation contains other language supporting the conclusion that the date represented an express condition precedent. Given the central importance of the exchangeability feature to the overall transaction, if the intent of Section 4.1(d) was to prevent the stock exchange if the certificate of designation was filed days or weeks after March 31, 1998, one would expect to find some reference to this topic in the loan agreement or related documents. We find none, and M&I points us to none. For example, the loan agreement provides that

Guaranty Bank was "to deliver to M&I promptly after receipt any and all shares of" the stock at issue, and that all such delivered stock is subject to the collateral pledge agreement "to the same extent as if such stock were delivered to M&I on the Closing Date" of March 30, 1998. It conflicts with M&I's interpretation of Section 4.1(d) for the loan agreement to contain such references to merely "prompt" delivery of shares to M&I not pegged to any particular date.

¶ 41. For all of these reasons, we conclude that Section 4.1(d) cannot be reasonably interpreted to mean that OTS was barred from triggering the automatic exchange in April 2009 because of the alleged failure of Guaranty Bank to have filed documents designating the REIT preferred stock before March 31, 1998. Therefore, the OTS directives were not invalid on the basis of the condition precedent alleged by M&I.

### C. OTS Directives as Valid, Formal Federal Agency Action

¶ 42. M&I contends that the OTS directives were not valid, formal actions carrying preemptive authority for two reasons. First, M&I argues that the federal regulation on which OTS could base its preemptive authority in this context, 12 C.F.R. § 545.2, creates preemptive power only for actions of OTS related to savings association "operations" not at issue in this case. Second, M&I argues that the directives were merely informal and unenforceable, and therefore without preemptive authority. We address these contentions in turn.

¶ 43. M&I argues that the circuit court "erroneously ignored" the presumption against preemption in making its preemption decision in this case. However,

our review of the record reflects conscientious consideration by the circuit court of the factual and legal issues presented to it by the parties, and in any case our review of this legal issue is de novo. For the following reasons, even applying the presumption against preemption, as we do, there is a clear and direct conflict between the authorized operation of federal law and this state court action.

## 1. 12 C.F.R. § 545.2: "*Operations*"

¶ 44. As referenced above at ¶ 19 & n.7, it is beyond dispute that Congress delegated to the OTS exceedingly broad authority to regulate federal savings banks. OTS has summarized this delegation in 12 C.F.R. § 557.11:[9]

> (a) Under sections 4(a), 5(a), and 5(b) of the HOLA, 12 U.S.C. 1463(a), 1464(a), and 1464(b), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when appropriate to:
>
> (1) Facilitate the safe and sound operations of federal savings associations;
>
> (2) Enable federal savings associations to operate according to the best thrift institutions practices in the United States; or
>
> (3) Further other purposes of HOLA.

¶ 45. The two sides in this appeal disagree about whether OTS in this case acted pursuant to a regulation promulgated under the broad statutory authority that

---

[9] This summary appears in a part of the regulations specifically addressing deposit-related regulations, but is not limited to that topic.

preempts state law. M&I points out that OTS has issued regulations addressing preemption that vary to some degree by subject matter, and then, within each subject matter, carve out types of actions not subject to preemption. From this M&I argues that the OTS directives do not fall within an area for which the OTS regulations claim preemptive authority. We conclude that, even applying the presumption against preemption, the action OTS took here in directly addressing the solvency of Guaranty Bank, using the very tool contemplated by the parties to address capitalization concerns, had preemptive authority under the applicable regulation.

¶ 46. The parties agree that the most relevant OTS regulation is one addressing preemption related to the "operations" of federal savings associations, 12 C.F.R. § 545.2:

> The regulations in this part 545 are promulgated pursuant to the plenary and exclusive authority of [OTS] to regulate *all aspects of the operations* of Federal savings associations, as set forth in section 5(a) of the Act [now codified at 12 U.S.C. § 1464, quoted in relevant part above]. This exercise of the [OTS's] authority *is preemptive of any state law purporting to address the subject of the operations of a Federal savings association.*

(Emphasis added).

¶ 47. M&I argues that the word "operations" in 12 C.F.R. § 545.2 refers only to specific functions of federal savings associations addressed in Part 545, which are narrowly defined.[10] Any broader interpretation of "operations," M&I contends, would treat § 545.2 as a "field"

---

[10] M&I points to the following specific functions as the only "operations" at issue: authority to act as a surety for public deposits, 12 C.F.R. § 545.16(b); authority to serve as a deposi-

preemption provision that would preempt all state claims that involve any aspect of a savings association. Further, M&I argues, OTS, relying on its delegated authority from Congress, could not have intended what amounts to "field" preemption through use of the word "operations" here, because the OTS regulations also include 12 C.F.R. § 560.2,[11] which contains a broad and

---

tory for federal taxes and public money, or a fiscal agent for the government, 12 C.F.R. § 545.16(c); authority to make customer-approved transfers of customer funds, 12 C.F.R. § 545.17; the obligation to notify the appropriate OTS regional office of address changes, 12 C.F.R. § 545.91; authority to open branch offices, 12 C.F.R. § 545.92; requirements regarding application and notice of branch and home offices, 12 C.F.R. § 545.93; authority to establish an agency office to undertake such activities as selling real estate owned by the savings association and record retention requirements, 12 C.F.R. § 545.96; limited authority to act as fiscal agent of the secretary of the treasury, 12 C.F.R. § 545.101, and; required indemnification of directors, officers, and employees, 12 C.F.R. § 545.121.

[11] Entitled "Occupation of field," 12 C.F.R. § 560.2(a) provides:

> Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws *affecting the operations of federal savings associations* when deemed appropriate *to facilitate the safe and sound operation of federal savings associations,* to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), *OTS hereby occupies the entire field of lending regulation for federal savings associations.* OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, *without*

detailed preemption scheme, addressing "lending and investment" practices, which M&I contends would be unnecessary if the word "operations" in § 545.2 did not have a limited purpose. In other words, M&I's position is that § 545.2 must be limited in scope, otherwise § 560.2's extensive preemptive authority would not be necessary.

¶ 48. A similar argument to the one M&I now makes was advanced and rejected in *Wisconsin League of Financial Institutions, Ltd. v. Galecki*, 707 F. Supp. 401 (W.D. Wis. 1989). In that case, federal savings institutions brought a declaratory judgment action against state officials, seeking to bar application of a new Wisconsin law regulating tax escrow accounts associated with mortgage loans administered by the plaintiffs and requiring certain disclosures. *Id.* at 402. The plaintiffs argued that their handling of escrow accounts and loan disclosures was exclusively regulated under the supervision of the Bank Board (which, as explained above, was a predecessor agency of OTS)

*regard to state laws purporting to regulate or otherwise affect their credit activities,* except to the extent provided in paragraph (c) of this section or § 560.110 of this part. *For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.*

(Emphasis added.) The preemptive reach of 12 C.F.R. § 560 is further refined by 12 C.F.R. § 560.2(b) (listing thirteen, non-exclusive examples of "types of state laws preempted," such as those "purporting to impose requirements regarding" "Loan-to-value ratios" and "Access to and use of credit reports") and by 12 C.F.R. § 560.2(c) (specifying that state laws of certain types, such as "Contract and commercial law," "are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section.").

201

under the same statutory authority at issue in the instant appeal. *See id.* at 404–05. Addressing 12 C.F.R. § 545.2, the court stated,

> [T]he structure of the present regulations makes it apparent that the preemption expressed in § 545.2 extends to all operations of federal savings institutions whether or not the regulations substantively regulate that aspect of the operations.
>
> ... Under the interpretation advanced by defendants the Bank Board would be required to affirmatively express by regulation every power held by a federal institution or risk restrictions by the states.

*Id.* at 405.

¶ 49. We find *Galecki* persuasive on this point. The term "operations" is not defined in 12 C.F.R. § 545, as one would expect if the preemptive authority expressed in 12 C.F.R. § 545.2 were limited to specific functions. As the court in *Galecki* suggests, § 545 is not written as though it were describing particular functions as "operations" for purposes of preemption. Indeed, a number of the functions listed by M&I as examples are not explicitly identified as "operations," making it difficult to consistently interpret § 545 as M&I suggests. *See, e.g.,* 12 C.F.R. § 545.93 ("Application and notice requirements for branch and home offices") (making no use of the term "operation").

¶ 50. Further, the way in which the word "operations" is used in various provisions of 12 C.F.R. § 545 would make little sense if the term had this limiting meaning. For example, 12 C.F.R. § 545.91(a) reads, "All operations of a Federal savings association . . . are subject to direction from the [association's] home office." Use of the phrase "all operations" in § 545.91(a), with-

out any qualifying definition or reference, would appear to include functions beyond those defined in the limited manner M&I suggests.

¶ 51. As to 12 C.F.R. § 560.2, that provision explicitly addresses "lending and investment" functions, which are not at issue in this case. It is true that the "lending and investment" preemption provision is broad and detailed, but M&I fails to persuade us that the agency has not created, in 12 C.F.R. §§ 545.2 and 560.2, two separate and broad preemption provisions addressing two sets of savings bank functions. It would be coherent and rational for the agency to have determined that both the "operations" and "lending and investment" preemptive sections should be broad to the point where they might have some overlapping effect, in that they preempt the operation of states' laws relating to some of the same savings bank functions.

¶ 52. Further, we need not determine the outer limits of the preemptive authority provided by 12 C.F.R. § 545.2 in order to conclude that the directives at issue in this case unquestionably involved core "operations" of Guaranty Bank. As foreshadowed in the March 2009 OTS cease and desist orders warning of diminished capital levels and poor earnings, the April 2009 OTS directives cited impending undercapitalization, a trend that could readily affect each and every "operation" of the savings bank, however defined, because it involved the continued viability of the institution as a whole.

¶ 53. M&I cites California state court decisions for the proposition that state law tort and consumer protection actions have been found not to be preempted under 12 C.F.R. § 545.2. *See, e.g., Fenning v. Glenfed*, 40 Cal. App. 4th 1285 (1995). However, those cases are readily distinguishable from this case, and therefore are of no persuasive value. These cases do not involve direct

state law challenges to actions of Federal bank regulators, as this case does. In *Fenning*, for example, the plaintiffs alleged fraud, negligent misrepresentation, and unfair and deceptive business practices by a bank in allegedly blurring the distinction between securities offered for sale by the bank and those offered for sale by a brokerage firm. *Id.* at 1289–90. *Fenning* favorably cited *Galecki*, and stated that the preemption question is "whether the causes of action alleged in the complaint 'purport to address the subject of the operations' of the Bank." *Fenning*, 40 Cal. App. 4th at 1296. The conclusion of the California court that the variety of consumer fraud at issue in that case is not preempted does not add to the analysis in this starkly different circumstance, and its citation to *Galecki* as the correct standard supports the defendants' position.

¶ 54. For these reasons, we conclude that 12 C.F.R. § 545.2 provided a basis for OTS to exercise its preemptive authority in issuing the directives.

## 2. *Enforceability of Directives*

¶ 55. M&I argues that preemption is inappropriate because the OTS directives did not constitute formal, enforceable orders. That is, M&I contends that they were merely informal supervisory directives that did not compel compliance by the defendants, and therefore lacked preemptive force. This argument is not about the preemptive authority of OTS in general, but instead whether OTS used a vehicle, in attempting to accomplish its objectives, that represented a valid exercise of preemptive authority. As explained below, we conclude that, even assuming that the directives are categorized as "informal" actions, they constituted

highly time sensitive, unambiguous demands of federal regulators enforcing federal law, and therefore had preemptive effect.

¶ 56. Each directive was formatted as a letter with the subject line, "Directive to Exchange Preferred Stock." The directive to the REIT stated as follows:

> Pursuant to Section 4.1(d) of the charter of GB REIT Corporation (REIT), the Office of Thrift Supervision (OTS) directs the REIT's Board of Directors to exchange each authorized and issued share of the REIT's Floating Rate Noncumulative Exchangeable Preferred Stock, Series A for one share of Floating Rate Noncumulative Preferred Stock, Series A authorized and issued by Guaranty Bank (Bank), Milwaukee, Wisconsin (Automatic Exchange). The Automatic Exchange shall be effective at 8:00 a.m. Milwaukee time on Tuesday, April 28, 2009.
>
> The OTS, as the appropriate regulatory agency with sole discretion pursuant to Section 4.1 of the REIT's charter, anticipates the Bank becoming "undercapitalized" under Prompt Corrective Action regulations, 12 CFR Part 565, in the near term.
>
> Should you have any questions please do not hesitate to contact Assistant Director [name and telephone number].

¶ 57. The directive to Guaranty Bank opened as follows (with the balance of the text tracking exactly the same language used in the directive sent to the REIT):

> Pursuant to Section 5(C) of the charter of Guaranty Bank (Bank), the Office of Thrift Supervision (OTS) directs the Bank's Board of Directors to exchange one share of the Bank's authorized Floating

Rate Noncumulative Exchangeable Preferred Stock, Series A for each share of GB REIT Corporation's Floating Rate Noncumulative Preferred Stock, Series A (Automatic Exchange) . . . .

¶ 58. We first address a reference in the directives that is central to the arguments of the parties, namely the statement that OTS "anticipates the Bank becoming 'undercapitalized' under Prompt Corrective Action regulations, 12 C.F.R. Part 565, in the near term." This was notification that OTS, following up on the cease and desist orders,[12] had now concluded that Guaranty Bank was nearing "undercapitalization" status for purposes of the prompt corrective action provisions of the Prompt Corrective Act, 12 U.S.C. § 1831o. That federal statute categorizes insured depository institutions as falling into one of five capital categories at a given time: well capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, or critically undercapitalized. 12 U.S.C. § 1831o(b).

¶ 59. M&I argues that the directives themselves were not prompt corrective actions, or any other formal enforcement action, as defined in a 2008 regulatory bulletin of OTS, called an "examination handbook."[13] Under the handbook, OTS enforcement actions are categorized as either "informal" or "formal," and only formal enforcement actions are enforceable. M&I argues that because the OTS directives in this case do not fit into one of the thirteen categories of formal enforce-

[12] M&I acknowledges on appeal that the OTS March 2009 cease and desist orders to the defendants should be categorized as "formal enforcement orders."

[13] OFFICE OF THRIFT SUPERVISION, U.S. DEP'T OF TREASURY, OTS REGULATORY BULLETIN NO. 37–23, EXAMINATION HANDBOOK, Section 080 (2008).

ment actions listed in the handbook—such as cease and desist orders, injunctive actions, and prompt corrective actions—preemption is not possible. This is the case, M&I contends, because only federal actions that are *in themselves enforceable* may preempt state law. M&I asserts that OTS could have, but did not, "escalate the matter by taking formal enforcement actions."

¶ 60. As authority for its position, M&I cites only cases repeating propositions, not contested in this appeal, that preemptive authority must rest on federal law, not law derived from other sources (such as contract terms), and on an actual conflict between state law and a valid federal statutory scheme.

¶ 61. We do not agree with M&I that the OTS guidance materials provide a basis for concluding that OTS selected an improperly formatted or procedurally defective vehicle to accomplish its unambiguous objective. OTS gave unambiguous direction, which was mandatory on its face, to parties who were "unconditionally obligated," under the terms of Section 4.1(d) of the REIT certificate of incorporation, to follow that direction. There can be no doubt that OTS intended to, and did, use the directives to give precise directions constituting an "Exchange Event" under the terms of § 4.1(d)(2), which requires only that the agency "directs in writing" for the exchange to occur. Section 4.1(d)(4) provides that upon such an "Exchange Event," the exchange "shall occur as of 8:00 a.m. Eastern Time on the date for such exchange set forth in the Directive." M&I does not provide us with legal authority suggesting that, in the preemption context, we should not follow the general rule that courts defer to administrative agency decisions properly delegated to the agency and made based on the agency's expertise in the inter-

ests of uniformity and consistency. *See Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 660–62, 539 N.W.2d 98 (1995).

¶ 62. We see no reason that we should be less deferential in the preemption context, because as a general matter preemption is determined by the intent of Congress to displace or trump the operation of state law, not by the particular modes by which federal officials execute the federal laws. *See Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 38, 284 Wis. 2d 224, 700 N.W.2d 139 ("state laws must yield to the federal law" when Congress expressly or impliedly preempts "contradictory —or even coterminous—state laws"). A state law is preempted when it "frustrates the purpose of . . . national legislation, or impairs the efficiencies of . . . agencies of the federal government to discharge the[ir] duties," *McClellan v. Chipman*, 164 U.S. 347, 357 (1896), whether or not that purpose or those efficiencies are expressed in the precise form of an enforceable order.

¶ 63. Thus, for example, the defendants point to persuasive authority in the form of a federal district court opinion holding that a state court fraudulent conveyance claim challenging the purchase of assets from an institution regulated by the Federal Savings and Loan Insurance Corporation (FSLIC)[14] was preempted by federal law. *Sweet Jan Joint Venture v. Federal Deposit Ins. Corp.*, 809 F. Supp. 1253, 1258 (N.D. Tex. 1992). The court made that determination

[14] Just as FIRREA abolished the Bank Board and created OTS, *see supra* ¶ 19, it also abolished FSLIC and transferred its insurance functions to the Federal Deposit Insurance Corporation. *See United States v. Winstar Corp.*, 518 U.S. 839, 856 (1996).

because the relief sought "would undo a transaction that would not have occurred without" approval of FSLIC. *Id.* There appears to have been no specific order or directive involved in the case, but instead the decision rested in part on the " '[s]ensitive federal interests . . . implicated when FSLIC rescues an insolvent savings and loan.' " *See id.* (citation omitted). The court held that "'Texas law presents an obstacle to accomplishment of congressional objectives where, as here, the FSLIC's assistance decisions can be overturned on the basis of state law." *Id.*

¶ 64. M&I seeks to distinguish this persuasive authority on the grounds that the FSLIC actions at issue there related to its capacity as a receiver, whereas in this case OTS was not directly exercising authority over assets of a regulated entity. However, this distinction is not significant as it relates to the preemption question at issue here, namely whether the OTS directives lacked preemptive force because they were apparently not in the form of enforceable orders. In each case, there was a direct federal interest in the solvency of the regulated entity, and the state court action threatened to "undo" the agency's attempt to manage the solvency issue.

¶ 65. For these reasons, we conclude that the OTS directives had preemptive authority.

## CONCLUSION

¶ 66. In sum, we conclude that the agency directives were not invalid due to the alleged condition precedent in the REIT's certificate of incorporation, that the federal regulation at issue created preemptive authority for the directives, and that the directives

carried the force of federal law relevant for preemption purposes. Accordingly, we affirm the circuit court's order dismissing the complaint on preemption grounds, and do not reach additional arguments made by the defendants for dismissal of M&I's complaint.

*By the Court.*—Order affirmed.